**United States District Court**
For the Northern District of California

1

2

3

4

5              UNITED STATES DISTRICT COURT

6              NORTHERN DISTRICT OF CALIFORNIA

7

8    DAVID SLACK, *et al.*,                         No. C-13-5001 EMC

9              Plaintiffs,

10        v.                                        **ORDER GRANTING DEFENDANTS'**
                                                    **MOTIONS TO DISMISS WITH LEAVE**
11   INTERNATIONAL UNION OF                         **TO AMEND**
     OPERATING ENGINEERS, *et al.*,
                                                    **(Docket Nos. 99, 106-107, 109, 114)**
12
              Defendants.
13   _____/

14

15

16        Plaintiffs David Slack, John Jarboe, Ken Bettis, Kenny Mendoza, and Clyde Eli are either

17   current or retired members of International Union of Operating Engineers, Local 3 ("Local 3"), the

18   largest local trade union operating under the International Union of Operating Engineers ("IUOE").

19   First Amended Complaint ("FAC") ¶¶ 1, 7-11.  In their 125 page, 526 paragraph amended

20   complaint, Plaintiffs assert numerous federal and state causes of action against 51 defendants

21   alleging various acts of misconduct in the administration of the IUOE, Local 3, and the associated

22   employee benefit funds.  The defendants in this action include the IUOE itself, the OE Federal

23   Credit Union, the OE Hawaiian Industry Stabilization Fund ("HISF"), the third party administrator

24   of several Local 3 affiliated ERISA employee benefit funds, and dozens of individuals who serve as

25   officers of the IUOE, Local 3, and/or directors of the Local 3 affiliated ERISA funds.[1]

26   _____

27        [1] The filing of extremely lengthy complaints against dozens of Defendants – thus resulting in
     several iterations of amendments and complicated motion practice – appears to be a recent *modus*
28   *operandi* of Plaintiffs' counsel.  In addition to this action, Plaintiffs' counsel are currently litigating
     two similar actions against IUOE affiliated entities and personnel in the Central District of

1    The Defendants have – in five separate motions to dismiss – moved to dismiss all of the

2    causes of action.  For the following reasons, the Court **GRANTS** the motions to dismiss in part, but

3    will afford Plaintiffs an opportunity to amend.

4    **I.    FACTUAL AND PROCEDURAL BACKGROUND**

5    Plaintiffs allege a number of discrete acts of wrongdoing by various Defendants.

6    Specifically, Plaintiffs allege: (1) The HISF was operated as a quasi-PAC and not as a "compliance

7    fund"; (2) the IUOE forced officers and employees to contribute to a PAC; (3) employees of Local 3

8    (and its benefit plans) have been forced to contribute to Russ Burns' re-election fund; (4) the trustee

9    defendants violated their fiduciary duties in a variety of actions taken with regards to Local 3's

10   ERISA-governed employee benefit plans; (5) that the trustee defendants violated their fiduciary

11   duties by engaging in self-dealing and/or mismanagement of union funds; and (6) defendants

12   permitted a culture of violence and intimidation to pervade Local 3 operations.  Rather than attempt

13   to describe in detail the allegations contained in Plaintiffs' sprawling FAC, the Court summarizes

14   these broad categories below.

15   A.    Allegations Relating to the HISF Operations

16   Plaintiffs allege that the HISF was created for the "purpose of enforcing contractor

17   compliance with prevailing wage obligations" and to deter contractors from operating "double-

18   breasted."  FAC ¶ 94.  HISF receives $0.44 per hour worked by members of Local 3 in District 17

19   (*i.e.*, the Local 3 district encompassing Hawaii and Pacific Rim locations).  *Id.* ¶ 96.  HISF also

20   receives a "small amount of extra money per hour" from employers.  *Id.*  Despite its stated purpose,

21   Plaintiffs allege that HISF is operated as a "quasi-political action fund, operated by Local 3 to

22   advance political agendas on the island, and as a slush fund abused by HISF employees to enjoy

23   extravagant trips, expensive lunches, limousines, and the like."  *Id.* ¶ 99.  Further, it is alleged to be

24   a means to divert member's wages to other union officers outside Hawaii.  *Id.*  HISF funds –

25

26   ──────────────

27   California.  *See Pette v. IUOE, et al.*, No. 12-9324-DDP-VBK (operative complaint is a second
     amended complaint that is 115 pages in length and brought against 44 defendants); *Salas v. IUOE, et*
28   *al.*, No. 12-10506-DDP-VBK (operative complaint is a *fourth* amended complaint that is *220* pages
     in length and brought against 26 defendants).

United States District Court
For the Northern District of California

1    amounting to more than roughly $1,000,000 annually – are "used to hire lobbyists and used as a

2    slush fund by Hawaii officers and administrators."  *Id.* ¶ 100.

3        Plaintiffs allege that the "HISF Trustee Defendants" knew or should have known that they

4    were failing to fulfill their fiduciary duties by failing to honor HISF's stated purpose of ensuring

5    contractor compliance.  *Id.*

6        Plaintiffs' claims against Defendant OE Federal Credit Union ("OEFCU") appear to revolve

7    solely around its alleged role in the HISF scheme.  Plaintiffs allege that HISF is the only Local-3

8    affiliated fund that does not deposit its contributions in First Hawaiian Bank.  *Id.* ¶ 103.  Instead,

9    these contributions go to OEFCU.  *Id.*  It is from OEFCU that HISF funds are allegedly

10   misappropriated.  For example, Plaintiffs allege that Defendant Russ Burns – a Vice President of

11   IUOE, Local 3's Business Manager, and Chairman of the Board of OEFCU – permitted $4,000,000

12   from HISF to be "loaned" to Local 3 operations in Utah but that this money has disappeared and has

13   not been accounted for in any financial reporting.  *Id.* Plaintiffs assert that the OE Federal Credit

14   Union Directors – many of whom are also HISF trustees – "knew about the true nature of the HISF"

15   and did nothing to remedy resulting losses from such misappropriations.  *Id.*  Further, it is alleged

16   that the OE Federal Credit Union Directors "ratified the HISF deception and illegal conduct each

17   and every time they accepted deposits of HISF funds without questioning the ongoing misconduct."

18   *Id.*.

19   B.   <u>Allegations Related to Alleged Forced Contributions to IUOE's President's Club</u>

20       Plaintiffs allege that in 2008, Defendant Vince Giblin (General President of IUOE at the

21   time) informed the members of the General Executive Board that "all of them and all employees of

22   their local unions would be required to contribute to the President's Club."  *Id.* ¶ 106.  The

23   President's Club (also known as EPEC) is IUOE's political action fund ("PAC").  *Id.* ¶ 105.  Mr.

24   Giblin purportedly "left no room for doubt that the contribution mandate had to be communicated to

25   all local unions and that local union employees had to comply or face harsh consequences."

26   ///

27   ///

28   ///

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

*Id.* ¶ 106.[2]  The purpose of these required contributions was Mr. Giblin's "desire to elevate the stature of IUOE as a political force through aggressive donations to political candidates."  *Id.* ¶ 115.

Members of the General Executive Board, such as Defendants Burns, Jim McLaughlin, and William Waggoner were then charged with implementing Mr. Giblin's command.  Specifically, Plaintiffs allege that they "made their employees aware of the mandate from Defendant Giblin."  *Id.* ¶ 107.  On information and belief, Plaintiffs allege that IUOE monitored the contributions to the PAC by new union employees by "improperly accessing confidential documents submitted for new hire participation in its General Pension Plan and comparing the numbers of employees identified in the pension records with the number of employees last reported by the local union."  *Id.* ¶ 108.  James Van Dyke, Mr. Giblin's enforcer, would then call local union officers if it appeared that employees were not contributing to the PAC and demand that the contributions begin immediately.  *Id.*

The mandatory contributions to the PAC have been accomplished through compulsory payroll deductions.  *Id.* ¶ 110.  When new employees started, they would be presented with an authorization form for the deductions.  *Id.*  They were encouraged to complete the authorization and, when that failed, "hardball tactics are applied, and the resisting individual is told that they must contribute if they want to keep their job."  *Id.*  "Consent" was therefore coerced as new employees had no choice to contribute.  *Id.*  The amount of the contribution was "up to $800 per year, calculated as one percent of $80,000, the salary cap for this contribution."  *Id.* ¶ 105.

Plaintiffs allege that the Local 3 Officer Defendants and the Executive Board Defendants "did absolutely nothing to oppose this illegal course of conduct, thereby ratifying the conduct and aiding and abetting in the illegal scheme."  *Id.* ¶ 118.  Rather, they "directly participated in the illegal scheme by collecting the illegally monies withheld from employees' paychecks by employers and then passing them along to the IUOE."  *Id.*

---

[2] When Defendant Callahan replaced Mr. Giblin as General President, "he continued to require enforcement of the contribution mandate by threat of retaliation against non-compliant local union employees."  *Id.* ¶ 108.

4

United States District Court

For the Northern District of California

C.    Forcing Local 3 Employees to Contribute to Defendant Burns' Re-Election Fund

Plaintiffs allege that Defendant Burns has continued the tradition of previous Local 3 Business Managers and have forced "employees of both Local 3 and the various Local 3 Taft-Hartley Trusts to contribute to re-election campaign funds for Russ Burns's slate of candidates." *Id.* ¶ 160. Plaintiffs claim that the requirement to contribute is enforced by the threat of termination or loss of their positions if they fail to contribute. *Id.* ¶ 161. Specifically, former staffers report that they had to contribute every election cycle, with the precise amount required tied to the position they held – $1,000 for business agents, $1,500 for district-level employees, and $5,000 for officers. *Id.* ¶ 162. Defendant Burns is alleged to have accumulated more than $200,000 to support his slate of candidates. *Id.*

D.    Allegations Regarding Alleged Breaches of Fiduciary Duty Relating to Local 3's Employee Benefit Plans

Plaintiffs allege that those Defendants who serve as directors or trustees of the various ERISA trust funds have breached the fiduciary duties they owed to the funds. The alleged breaches relating to the ERISA-governed trust funds fit into six categories, which are described as follows.

1.    First:  Longview Amalgamated Bank Pension Investment

In 2008, the Defendants who serve as trustees of the OE Pension Fund ("Pension Fund") committed $100,000,000 of the Pension Fund in the Longview Ultra Construction Loan Investment Fund ("Longview Construction Loan Fund") – an investment vehicle with Amalgamated Bank. *Id.* ¶¶ 120, 121. Payments were made in increments beginning in or about 2009. *Id.* ¶ 122. The Longview Construction Loan Fund "touted investments in construction loans as the mechanism for returns on investor assets." *Id.* ¶ 124. Plaintiffs allege, however, that the investments were "poorly evaluated, as many of the major construction projects were never completed," thus requiring Amalgamated Bank to foreclose on a number of real estate projects to reduce losses it suffered. *Id.*

In 2011 – following the investment by Local 3's Pension Fund – the FDIC entered into a Consent Order with Amalgamated Bank, regarding charges that Amalgamated Banks "cooked the books" related to its loan conditions. *Id.* ¶ 125. For example, "[o]n loans that were more than 90 days delinquent, Amalgamated was concealing the failure to make installment payments on loans by

5

**United States District Court**
For the Northern District of California

1  hiding that debt at the end of loans." *Id.* Ultimately, its inaccurate asset reporting lead to a

2  dangerously low capitalization. *Id.* Plaintiffs allege that the FDIC worked with Amalgamated Bank

3  for two years prior to the issuance of the Consent Order – meaning that the problems it identified

4  were present at the time the Pension Fund invested its assets in the Longview Construction Loan

5  Fund. *Id.*

6      Ultimately, prior to the final $10,000,000 investment, the Pension Fund Trustee Defendants

7  learned that the Pension Fund "had lost approximately $47,000,000 of the $90,000,000 it had

8  invested in this investment vehicle." *Id.* ¶ 123.  As of December 31, 2010, roughly $50,000,000 has

9  been lost. *Id.* Plaintiffs claim that this $50 million loss made the Pension Fund's "critical" status

10 "more critical" to the point where it was only 67% funded in 2012 (as compared to 72% in 2010 and

11 2011 and 70% in 2009). *Id.* ¶ 129.

12     Plaintiffs allege that the Pension Fund Trustee Defendants failed to conduct a prudent

13 investigation into the Longview Construction Loan Fund investment.  Specifically, Plaintiffs allege

14 that Defendant William Waggoner "strongly pressure[d] locals, including Local 3, to invest their

15 funds in Amalgamated Bank investment vehicles, including the bank's Longview product line." *Id.*

16 ¶ 120.  The Longview product line was sold to the locals by Mr. Waggoner's wife, Patricia

17 Waggoner, who serves as "Vice President at Amalgamated Bank in charge of Taft-Hartley

18 investments." *Id.* On or about 2008, Ms. Waggoner attended a Local 3 Pension Trustee meeting to

19 "pitch" investments by the Pension Fund in the Longview Construction Loan Fund. *Id.* ¶ 121.  She

20 was "unable to give adequate answers" to the Trustee's questions and simply passed out flyers. *Id.*

21 After that, Carl Goff – Local 3's Vice President – fielded the substantive questions with another

22 Amalgamated Bank Representative. *Id.* Plaintiffs then allege that Carl Goff helped promote the

23 Longview Construction Loan Fund "at least partly due to his relationship with the Waggoners,

24 whose son, Kenneth Waggoner, was then dating his daughter, LeAnne (the two are now married)."

25 *Id.* ¶ 127.

26     Plaintiffs allege that Ms. Waggoner's inability to answer the Trustees' questions and the

27 Trustees' knowledge of the Goff-Waggoner relationship should have prompted them to "investigate

28 in greater detail the legitimacy" of their investment proposals. *Id.* ¶ 121, 127.  Instead, the Pension

6

United States District Court
For the Northern District of California

Fund Trustee Defendants "did little if any independent investigation of the proposed investment in the way that a prudent person acting reasonably under similar circumstances would do" and "simply proceeded with the investment without engaging in proper due diligence." *Id.* ¶¶ 122, 127.

2. Second:  Permitting Double-Breasted Operations

"Double-breasted contractors" are those who operate two contracting companies in parallel – one for jobs that use union workers and one for jobs that do not use union works. *Id.* ¶ 94.  Plaintiffs allege that the "vast majority" of contractors who have signed a collective bargaining agreement with Local 3 have been "permitted by Defendants Burns, Goff and Reding, and the Trustees of all of the Local 3-affiliated trust funds to operate-double-breasted." *Id.* ¶ 130.[3]  "Many" of these contractors, in turn, are alleged to owe "hundreds of thousands, or even millions, of dollars in benefit contributions to Local 3 trust funds," but are still allowed to run non-union operations. *Id.* Plaintiffs provide a single example – Richard Lee Construction.  It is alleged that this construction company "owes more than $3 million to Local 3, but it has never been held accountable for that massive underpayment." *Id.*

Plaintiffs allege that "favored son" contractors are permitted to operate double-breasted "because of their special relationships with Defendant Officers and/or Trustees, who often receive direct kickbacks in the form of gifts, meals, special event tickets and the likes." *Id.*  Further, even those Trustees who are not directly influenced in this way are alleged to have "abandoned their fiduciary obligations by continuing to serve as Trustees when the integrity of the Local 3 trust funds has been compromised by this scheme, without taking steps to remedy the misconduct." *Id.* Further, the failure to seek to recover monies owed or seek to curtail the behavior – for example, by instituting litigation or calling for strikes of non-compliant contractors – is alleged to constitute a breach of fiduciary duties. *Id.* ¶ 131.

Finally, Plaintiffs allege that "Local 3 allows contractors operated by front organizations for the Yakuza and Triads to operate double-breasted." *Id.* ¶ 133.

---

[3] Defendant Dan Reding is alleged to be Vice President of Local 3 and a trustee of several Local 3 trust funds. *Id.* ¶ 35.  Defendant Card Goff is alleged to be President of Local 3 and a trustee of several Local 3 trust funds. *Id.* ¶ 37.

United States District Court
For the Northern District of California

3. <u>Third:  Concealment of Unsuccessful Investment Transactions and Uncollected Contribution Obligations</u>

Plaintiffs contend that various Defendants have "failed to disclose" massive investment losses to either union members and failed to describe the losses in "required DOL form 5500 filings." *Id.* ¶ 134.  For example, Plaintiffs allege that Local 3's Pension Fund invested approximately $160 million in hedge funds controlled by Austin Capital Management LTD – resulting in the loss of the investment as a result of Bernard Madoff's ponzie scheme. *Id.*  This loss was eventually not disclosed. *Id.*  Similarly, Plaintiffs allege that Defendant Burns has on "multiple occasions, without obtaining required Trustee approval in advance, written off or simply declined to collect unpaid contributions" to benefit plans owed by "Burns-favored employers." *Id.* ¶ 135. Plaintiffs provide two examples – Defendant Burns' failure to enforce CTS, Inc.'s fringe benefit obligations and Richard Lee Construction's $3,000,000 in unpaid contributions. *Id.*  Finally, Burns is alleged to have fired the administrator "who attempted to collect past due fund contributions from certain employers who Burns wanted to protect." *Id.*

The remaining ERISA trustee Defendants are alleged to have breached their fiduciary duties because they "knew or should have known" that Burns was breaching his fiduciary duties and did nothing to stop it. *Id.*

4. <u>Fourth:  No Policies to Ensure Return of Unused Expense Monies Provided to Employees</u>

Plaintiffs allege that employees of the various Trust Funds "were instructed and allowed to retain . . . unused expense funds, and receipts were not collected in a comprehensive way to support expenses." *Id.* ¶ 136.  They further allege that the "Local 3 officer Defendants" believed that allowing employees to keep such "fund monies for personal use, the employees would be unlikely to discuss or disclose the many improprieties they observed the Local 3 leadership committing." *Id.*  In essence, they allege this expense money was "hush" money. *Id.*  Finally, ATPA (the administrator of the various trust funds) and the ERISA trustee Defendants failed "to take steps to address that monies derived from the Trusts were being used for purposes inconsistent with the requirement that they be used solely for the benefit of participants and beneficiaries." *Id.*

8

**United States District Court**

For the Northern District of California

5.     Fifth:  "Hear USA" No Bid H&W Contract

Defendant Carl Goff is alleged to be a trustee of the OE Pensioned Health and Welfare Fund ("H&W Fund").  United Hearing Services, d/b/a Hear USA ("Hear USA") is a company for which Jillian Goff – Carl Goff's daughter – serves as agent and account manager.  *Id.* ¶ 138.  Plaintiffs allege the H&W Fund entered into a "no-bid" contract with Hear USA, but the FAC does not describe the subject matter of the contract.  Plaintiffs contend that this no-bid contract constituted a "prohibited transaction" under ERISA because the contract represented "a direct furnishing of good [sic] and services by Ms. Goff's company to the Plan on which her father was a trustee."  *Id.*

6.     Sixth:  Local 12's Failure to Pay Required Contributions for Traveling Local 3
        Members

Under the IUOE National Reciprocity Agreement, when a member of one local travels to another jurisdiction to work, "the other local unions should pay to Local 3 . . . the contributions to Local 3's Trust Funds for each traveling member."  *Id.* ¶ 139.  A process exists to ensure that Local 3 members receive appropriate pension credits for this work: (1) the Local 3 worker returns to Local 3 with his pay stubs; (2) Local 3 gives the member credit for the hours worked in the Pension Fund, even though Local 3 did not receive the actual contribution from the other local.  *Id.*  If Local 3 never recovers the credited amount from the other local, the Pension Fund will have incurred "an increased payment obligation with no current increase in funding" – a potentially major problem in light of the Fund's allegedly underfunded state.  *Id.*

Plaintiffs contend that Local 12 (managed by William Waggoner) has refused on repeated occasions to pay benefits to Local 3's members under the Reciprocity Agreement.  *Id.* ¶ 140.  Nonetheless, Defendant Burns and the other Local 3 Officer Defendants "persistently breach their fiduciary duties . . . by refusing to extract those contributions from Local 12, thereby harming Local 3 members."  *Id.* ¶ 140.  Further, Pension Fund Trustee Defendants are alleged to either "know this occurs or should know through the exercise of their supervisory function," and their failure to correct it constitutes a breach of their fiduciary duties.  *Id.*

E.    Alleged Fiduciary Breaches by Local 3 Officers Involving Self-Dealing or Mismanagement
      of Union Assets

Plaintiffs allege instances of purported theft or mismanagement of Union assets by a number of Defendants.  First, they allege that Defendant Goff (with approval of Defendants Burns and Reding), purchased $10,000 to $15,000 in prizes for a golf tournament using his own credit card, thus accruing "reward points cards at Best Buy." *Id.* ¶ 142.  Even though Defendant Goff was reimbursed for his expenses in buying the gifts, he kept the Best Buy reward points that Plaintiffs contend "should belong to Local 3." *Id.*  These reward points have a cash value redeemable at Best Buy, are "valued at thousands of dollars or more," and "would have offset the tournament gift purchases for the following year." *Id.*

Second, in September 2009, Defendant Burns traveled to Utah to participate in a "guided special moose hunt" worth approximately $10,000 to $12,000. *Id.* ¶ 143.  However, Burns was only charged $3,000 by the individual who sponsored the hunt – a lobbyist who is "paid to lobby on behalf of Local 3." *Id.*  Plaintiffs allege that this discounted hunting trip was an "illegal gratuity" to influence Defendant Burns' decision to create a special position in Utah for Defendant Justin Diston. *Id.*

Third, in 2011, Defendant Burns authorized Defendant Goff and Defendant Reding to travel to Utah to hunt Elk. *Id.* ¶ 144.  Local 3 allegedly paid for this trip under the guise of permitting these Defendants to attend a "Wellness Committee" meeting, despite the fact that neither defendant is an active participate in the Wellness or Best Practices Committee. *Id.*  Burns, Reding, and Goff are alleged to have violated their fiduciary responsibilities by either authorizing or accepting/using Local 3 assets for their "personal enjoyment/gain." *Id.* ¶ 146.

Fourth, Plaintiffs allege that Defendant Burns used union assets to purchase expensive wines for Local 3 activities from Silver Oaks Winery, where his wife was employed. *Id.* ¶ 147.  Often these purchases would reach into the tens of thousands of dollars, with one being approximately $24,000. *Id.*  Plaintiffs allege that after a recent event "where some wine was unopened," Defendant Burns and his secretary did not save the wine for a later event, but rather "took wines home for themselves." *Id.*  Plaintiffs allege this constitutes embezzlement.

United States District Court

For the Northern District of California

Fifth, Plaintiffs allege that Defendant Burns "never travels without security" or "several other union officers" to meetings in Hawaii or a Pacific Rim Island and that Local 3 pays for this expensive travel. *Id.* ¶ 148.  They claim that less expensive alternatives exist – such as Hawaii-based officers attending the meetings with Defendant Burns or to have Defendant Burns tele-conference. *Id.*  Finally, they claim that Defendant Burns frequently requires Local 3 to pay for multiple hotel rooms simultaneously at different hotels "so he doesn't have to pack up his belongings at one luxury suit while he stays at other suites on other islands." *Id.*

Sixth, Plaintiffs allege that Defendant Goff's daughter LeAnn Goff used Southwest Airline miles belonging to the Cal-Nevada Conference (a union-affiliated entity funded by the various locals) to purchase multiple tickets to travel between Sacramento and Los Angeles to see her boyfriend, Kenneth Waggoner. *Id.* ¶ 156.  It is alleged she did this while an employee for the Cal-Nevada Conference. *Id.*  When the alleged theft was discovered, she was terminated by the conference, but "no monies were returned to Local 3's general fund or the members as a result of Ms. Goff's embezzlement." *Id.*  ¶ 157.  Plaintiffs generally allege that Defendant Burns and the other officers "attempted to conceal LeAnn Goff's activities." *Id.*  ¶ 158.

Finally, Plaintiffs claim that in September 2009, negotiations for a new collective bargaining agreement between Local 3 and the company Road Machinery reached an impasse. *Id.*  ¶ 151.  Plaintiffs allege that Mr. Jim Price – Road Machinery's Vice President and General Manager – was subjected to a campaign to "terrorize him into acquiescing to desired terms for a new CBA." *Id.* ¶ 152.  Specifically, it is alleged that "union leaders went to Mr. Price's home and threatened Mr. and Mrs. Price there on more than one occasion." *Id.*  Mr. Price subsequently filed a lawsuit, with Defendant Diston and other union employees being named as a Defendant. *Id.* ¶ 153.  In 2012, this action was settled "for a sum in excess of $250,000.00" plus attorneys' fees. *Id.* ¶ 154.  Plaintiffs allege that this money would not have been expended "but for the wrongful conduct of Defendant Burns and his cabal." *Id.*

F.    Alleged Culture and Practice of Violence and Intimidation

Plaintiffs allege that Plaintiffs David Slack and Kenneth Mendoza have been subjected to acts of violence and intimidation.  Plaintiff Slack alleges that after he told a third party that union

United States District Court

For the Northern District of California

officials and trustees associated with the Pension Fund should go to jail, "labor leaders within Local 3 sought to terrorize Mrs. Slack at a time that they believed he would be out of town" so as to silence Plaintiff Slack. *Id.* ¶ 164. He further alleges that "Mr. Slack was actually home and armed" and "[a]fter tense moments, the management thugs departed." *Id.* ¶ 165.

Plaintiffs allege that Plaintiff Kenneth Mendoza was "beaten by four individuals at a union meeting for presenting opposition to a plan to change the multiplier on the Pension Fund" in a way that would have harmed Local 3 members. *Id.* ¶ 166. This beating was witnessed by Local 3 Officer Defendants, but they did not seek to remedy the misconduct "or to fulfill their fiduciary duties to Plaintiff Mendoza." *Id.* Plaintiffs allege that the beating "would not have been conducted without the advance knowledge and at least tacit approval or acquiescence of Burns." *Id.* ¶ 169. He was further informed when he sought relief from "local authorities," he was rebuffed and told if he pursued the matter he would be arrested. *Id.* Plaintiffs allege that the beating constitutes a violation of Title I of the LMRDA. *Id.*

## II.   LEGAL STANDARD

The bulk of Defendants' motions to dismiss seek dismissal of Plaintiffs' causes of action for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Rule 12(b)(6) allows for dismissal based on a failure to state a claim for relief. A motion to dismiss based on the rule essentially challenges the legal sufficiency of the claims alleged. *See Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir.1995). In considering a 12(b)(6) motion, a court must take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party, although "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).

While "a complaint need not contain detailed factual allegations . . . it must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "[N]aked assertions devoid of further

factual enhancement" are insufficient to state a plausible claim for relief. *Blantz v. Cal. Dep't of Corr. & Rehab*, 727 F.3d 917, 926-27 (9th Cir. 2013). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than sheer possibility that a defendant acted unlawfully." *Iqbal*, 556 U.S. at 678.

## III.   DISCUSSION

A.   The HISF Based Allegations Will Be Dismissed Without Prejudice for Lack of Subject Matter Jurisdiction

As detailed above, Plaintiffs have made a number of allegations relating to the operation of the HISF. Plaintiffs' factual allegations pertaining to the HISF are incorporated into only two of Plaintiffs' twenty causes of action – the twelfth cause of action for "common law breach of fiduciary duty" and the twentieth cause of action alleging a violation of the California Unfair Competition Law.[4] No federal cause of action expressly references, or relies upon, the HISF allegations. This Court only has jurisdiction over the twelfth and twentieth causes of action – and thus the HISF allegations more generally – if the supplemental jurisdiction provision of 28 U.S.C. § 1367 is satisfied. The Court finds it is not.

Federal courts have supplemental jurisdiction over state law claims that are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III." 28 U.S.C. § 1367(a). A state law claim is "part of the same case or controversy when it shares a 'common nucleus of operative fact' with the federal claims and the state and federal claims would normally be tried together." *Bahrampour v. Lampert*, 356 F.3d 969, 978 (9th Cir. 2004). While some courts have broadly stated that all that is needed to meet this standard is a "loose factual connection," *see Sanchez & Daniels v. Koresko*, 503 F.3d 610, 614 (7th Cir. 2007), other courts have recognized that the reference to a "common nucleus" suggests a factual overlap that "refers to something at the heart or center of the subject in question, not to a matter that

---

[4] The twelfth cause of action is officially listed as being "Based on HISF-Related Wrongful Practices," while the twentieth cause of action is listed as being "Based on HISF." FAC at 86, 115. The only other reference to "HISF" in the cause of action section of the amended complaint is a passing reference in a single sentence of the thirteenth cause of action – another state law cause of action for common law breach of fiduciary duty. This cause of action is not asserted against the HISF or the HISF Trustee Defendants  but only the "Local 3 Officer Defendants." *See id.* ¶ 350(c).

is peripheral or tangential," *Mason v. Richmond Motor Co, Inc.*, 625 F. Supp. 883, 886 (E.D. Va. 1986).  Ultimately,"it is not sufficient that the federal and state claims 'are not completely unrelated' to exercise supplemental jurisdiction." *Ariba, Inc. v. Coupa Software Inc.*, No. 12-cv-01484-WHO, 2014 WL 1466860, at *3 (N.D. Cal. Apr. 15, 2014) (quoting *Taiwan Semiconductor Mfg. Co. v. Semiconductor Mfg. Int'l Corp.*, No. C03-5761 MMC, 2004 WL 5212448 (N.D. Cal. Apr. 21, 2004)).

    Supplemental jurisdiction is lacking over counts 12 and 20.  Plaintiffs federal claims generally involved the following (omitting related claims seeking injunctive relief):

- Count 1:  ERISA claim based on Pension Fund Trustees breaching fiduciary duties pertaining to the Longview Construction Fund transaction.

- Count 2:  ERISA claim based on H&W Fund Trustees breaching fiduciary duties pertaining to Hear U.S.A. "no-bid" contract.

- Count 4:  ERISA claim based on failure of ERISA defendants to recover contributions from double-breasted operations or collecting past-due contributions.

- Count 6:  ERISA claim relating to improper use of expense funds for personal purposes.

- Count 8:  ERISA claim based on Pension Fund Trustees failing to ensure Local 12 made contributions owing to Local 3.

- Count 14:  LMRDA claim based on forced contributions to Burns' slate of candidates.

- Count 15:  RICO claim based on forced contributions to Burns' slate of candidates.

- Count 16:  RICO claim based on forced contributions to EPEC/Presidents' Club.

Here, the allegations made in Count 12 and 20 – that the HISF was held out as an industry compliance organization, but was, in fact, a front for a quasi-political action fund or Local 3 slush fund – do not arise out of a "common nucleus of operative fact."  Plaintiffs seek to tie the state law claims to the federal claims by arguing:

> Here, there is no doubt that the facts supporting the state law claims bear a direct relationship to the facts underlying the federal claims, as all of the claims concern misconduct by senior Local 3 officials – misconduct that the trustees of various Local 3 employee benefit plans

United States District Court

For the Northern District of California

1    including the Hawaii Trustees, participated in, condoned, or utterly
2    failed to remedy.

3    Docket No. 146, at 15.  Further, they claim that "all of the claims in the FAC concern 'millions of

4    dollars [that] were withheld and/or embezzled form Local 3 and its membership, much of which was

5    used by Defendant Russell E Burns . . . . for [his] personal benefit."  *Id.* at 16.

6         Plaintiffs are correct that in an abstract sense, the HISF claims are "related" to the federal

7    claims insofar as they all generally allege misconduct by Local 3 officials (and Defendant Burns'

8    involvement in that misconduct).  However, the test is not whether the state law claims are related to

9    the federal claims.  Rather, it is whether the claims are "so related" that they form the part of the

10   same case or controversy – a standard that is not met here.  *See* 28 U.S.C. § 1367(a).  First,

11   Plaintiffs' federal claims are fairly  discrete – for example, one involves only the Longview

12   Construction Fund investment, one the "no-bid" contract with Hear USA, others only the forced

13   contributions to EPEC/Presidents' Club.  Second, it is apparent that the witnesses and evidence

14   needed to prove their HISF-based claims will be distinct from the federal claims.  Specifically, what

15   the HISF's mandate is, how it has been held out to union members and regulators, and whether its

16   Trustees complied with the HISF mandate are major questions that are completely unrelated to any

17   issue presented in the federal claims.  *See, e.g.*, *Holton v. Conrad*, — F. Supp. 2d — , 2014 WL

18   2526979, at *1 (E.D. Ky. June 4, 2014) (finding no supplemental jurisdiction where the state law

19   claims "require proof of different facts, will involve different witnesses, and apply different law");

20   *Henriquez-Ford v. N.Y. City Dep't of Educ.*, No. 12 Civ. 6927, 2013 WL 4077876, at *2 (S.D.N.Y.

21   Aug. 3, 2013) ("Defendant's counterclaims do not share such a nucleus [of operative fact] because

22   they concern an entirely different time period, contain few overlapping facts, and would require

23   different evidence."); *compare Palmer v. Hospital Auth. of Randolph County*, 22 F.3d 1559, 1566

24   (11th Cir. 1994) ("While all the elements of the federal and state claims are certainly not identical,

25   and in some cases are quite different, each claim involves the same facts, occurrences, witnesses,

26   and evidence.").

27        The closest Plaintiffs come to tying the HISF-related state law claims to the federal causes

28   of action is the fact that certain ERISA causes of action allege that Defendants failed to prevent

"double-breasting" among contractors, while the HISF-related allegations include references to "double breasting."  *Compare* FAC ¶ 342 (asserting, in Count 12, that Defendants violated fiduciary duties based on the HISF scheme, in part, by "[t]he failure to prevent double breasting and to pursue remedies for same"), *with* FAC ¶ 94 (stating in ERISA cause of action that defendants violated fiduciary duties by failing to collect unpaid contributions due to Pension/H&W Funds allowing improper double-breasting).  However, this connection is ultimately insufficient to support supplemental jurisdiction over what are essentially distinct state law claims, involving a separate Fund not involved in any federal cause of action, and based on different facts.  *See Ariba*, 2014 WL 1466860, at *3 (finding no supplemental jurisdiction over theft of trade secrets state law claim because "[w]hile there may be minimal overlap between those issues and those necessary to litigate the patent case, it is insufficient to bring the state law claims within the same case or controversy as the patent claims").

Both the HISF-based state law claims and Plaintiffs' federal claims generally allege wrongdoing by the same or similar defendants.  However, this fact is simply insufficient to conclude that the claims are so closely related to constitute part of the same case or controversy.  *See, e.g.*, *Burke v. Dowling*, 944 F. Supp. 1036, 1070 (E.D.N.Y. 1995) ("The link between the two claims is that they both allege wrongdoing by some of the same defendants.  Thus it appears doubtful that these two claims can fairly be said to be part fo the same 'case or controversy.'").  For the foregoing reasons, Plaintiffs' twelfth and twentieth causes of action are **DISMISSED**, without prejudice, for lack of subject matter jurisdiction.[5]

B.    Defendants' Motions to Dismiss Plaintiffs ERISA Causes of Action for Lack of Standing
      Will Be Granted in Part and Denied in Part

Plaintiffs' first seven causes of action allege breaches of fiduciary duties under ERISA for various wrongdoings of the Trustees of the ERISA governed employee benefit funds.  Defendants

---

[5] OEFCU has filed a motion to dismiss Plaintiffs' twelfth cause of action on substantive grounds, arguing that as a financial institution, it did not owe any fiduciary duty to their customers. Docket No. 99. Because the Court has concluded that there is no subject matter jurisdiction over the twelfth cause of action, OEFCU's motion to dismiss is **DENIED** as moot.  Because OEFCU is not named as a Defendant in any other cause of action, it is dismissed, without prejudice, from this action.

1  Burns, Diston, Harris, and Reding have moved to dismiss each of these causes of action, contending

2  that Plaintiffs have failed to adequately allege standing under ERISA.  The Court concludes that

3  Plaintiffs have sufficiently alleged standing for those ERISA causes of action that seek equitable

4  relief, but have (with one exception) failed to allege standing for those ERISA causes of action

5  seeking monetary relief.  Further, the Court finds that with the exception of their first and second

6  causes of action, Plaintiffs have failed to state a claim under ERISA.  Plaintiffs will, however, be

7  afforded leave to amend.

8         1.   <u>Legal Standard</u>

9        Article III of the Constitution limits federal court jurisdiction to "cases" and "controversies"

10  – the concept of standing flows from this limitation.  *Tourgeman v. Collins Fin. Servs., Inc.*, — F.3d

11  — , 2014 WL 2870174, at *2 (9th Cir. June 25, 2014).  The purpose of the standing doctrine is to

12  ensure that the litigant "possess[es] a 'direct stake in the outcome' of the case.'" *Id.* (quoting

13  *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2662 (1997)).  "To establish Article III standing, a plaintiff

14  must show (1) an 'injury in fact.' (2) a sufficient 'causal connection between the injury and the

15  conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable

16  decision.'" *Susan B. Anthony List v. Driehaus*, — S. Ct. — , 2014 WL 2675871, at *5 (U.S. June 16,

17  2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

18        "A plan participant suing under ERISA must establish both statutory standing and

19  constitutional standing, meaning the plan participant must identify a statutory endorsement of the

20  action and assert a constitutionally sufficient injury arising from the breach of a statutorily imposed

21  duty."  *Kendall v. Employees Retirement Plan of Avon Products*, 561 F.3d 112, 118 (2d Cir. 2009).

22  *See Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928 (8th Cir. 2012) ("When a plaintiff

23  alleges injury to rights conferred by statute, two separate standing-related inquiries are implicated:

24  whether the plaintiff has Article III standing (constitutional standing) and whether the statute gives

25  that plaintiff authority to sue (statutory standing).").

26        With respect to statutory standing, Section 1132(a)(2) – the provision on which Plaintiffs

27  rest their monetary-damage ERISA claims – provides that a civil action may be brought by a

28

United States District Court

For the Northern District of California

1   "participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title."  29

2   U.S.C. § 1132(a)(2).  Section 1109, in turn, provides:

3           Any person who is a fiduciary with respect to a plan who breaches any
            of the responsibilities, obligations, or duties imposed upon fiduciaries
4           by this subchapter shall be personally liable to make good to *such plan*
            any losses to the plan resulting from each such breach, and to restore
5           *to such plan* any profits of such fiduciary . . . .

6   29 U.S.C. § 1109.  It is clear that the plain terms of § 1132(a)(2) authorize plan participants and

7   beneficiaries to file suits *on behalf of the plan* to recover damages/losses caused *to the plan*.  Thus,

8   "Plaintiffs cannot bring suit under § 1132(a)(2) to recover personal damages for misconduct, but

9   rather must seek recovery on behalf of the plan."  *Loren v. Blue Cross & Blue Shield of Mich.*, 505

10  F.3d 598, 609 (6th Cir. 2007).

11          However, just because ERISA permits Plaintiffs to file suit on behalf of an injured benefit

12  plan does not end the inquiry.  Plaintiffs must still must meet the Article III (constitutional) standing

13  requirements – injury in fact, causation, and redressability.  In other words, even where a plan

14  trustee breaches his fiduciary duty, a plan participant may not sue for that breach unless that breach

15  has caused *the plan participant* a cognizable injury that could be redressed by court action.  A

16  number of courts have examined when a plan participant will found to have been "injured" by a

17  breach of an ERISA trustee's breach of fiduciary duties.  In *La Rue v. DeWolff*, 552 U.S. 248 (2008),

18  the Supreme Court, in discussing when participants in a "defined benefit" plan will be deemed

19  "injured," noted that "[m]isconduct by the administrators of a defined benefit plan will not affect an

20  individual's entitlement to a defined benefit unless it creates or enhances the risk of default by the

21  entire plan."  *Id.* at 255.

22          Based on this statement in *LaRue*, federal courts have held that ERISA plan participants

23  lack standing to pursue § 1132(a)(2) claims where the alleged misconduct underlying their action

24  did not threaten "the entire plan."  Thus in *Fox v. McCormick*, — F. Supp. 2d — , 2013 WL

25  6439128 (D.D.C. Dec. 9, 2013), the district court dismissed for lack of standing an ERISA breach of

26  fiduciary duty claim based on the Trustees' alleged failure to collect contributions.  The court noted

27  that, generally, a "participant in a defined benefit plan can sue trustees for their failure to collect

28  contributions when the participant faces a risk of non-payment of his pension — such as when

18

United States District Court
For the Northern District of California

trustees' dereliction threatens the financial stability of a plan." *Id.* at *6. Thus, "unless a trustee's '[m]isconduct . . . creates or enhances the risk of default by the entire plan,' a participant in a defined benefit plan lacks Article III standing to sue." *Id.* (citation omitted). This approach is consistent with courts from around the country. *See, e.g.*, *David v. Alphin*, 704 F.3d 327, 338 (4th Cir. 2013) ("We find these risk-based theories of standing unpersuasive, not least because they rest on a highly speculative foundation lacking any discernible limiting principle. The Supreme Court has held that a participant in a defined benefit pension plan has an interest in his fixed future payments only, not the assets of the pension fund."); *Lee v. Verizon Comm'cns Inc.*, 954 F. Supp. 2d 486, 497 (N.D. Tex. 2013) ("Courts have consistently held that a loss that merely affects plan assets is insufficient to confer standing . . . .").

Standing for pursuing *equitable* relief under 29 U.S.C. § 1132(a)(3), however, is not so limited. Section 1132(a)(3) permits a plan participant to bring a civil action to "enjoin any act or practice which violates any provision of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3). "Although the Ninth Circuit has not yet addressed this specific legal issue, the other circuits that have considered it all agree that 'a plan participant may have Article III standing to obtain injunctive relief related to ERISA's disclosure and fiduciary duty requirements without a showing of individual harm to the participant.'" *A.F. ex rel. Legaard v. Providence Health Plan*, — F.R.D. — , 2013 WL 6796095, at *6 (D. Or. Dec. 24, 2013) (quoting *Cent. Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*, 433 F.3d 181, 199 (2d Cir. 2005)); *see also Horvath v. Keystone Health Plan East, Inc.*, 333 F.3d 450, 456 (3d Cir. 2003) ("Horvath need not demonstrate actual harm in order to have standing to seek injunctive relief requiring that Keystone satisfy its statutorily-created disclosure or fiduciary responsibilities.").

     2.   Plaintiffs' "Statutory Rights" Theory of Standing Fails as to Plaintiffs' Monetary Relief ERISA Causes of Action

To begin, Plaintiffs argue that they have standing to pursue all of their ERISA claims (whether they are seeking monetary or injunctive relief) under a "statutory rights" theory. In *Edwards v. First American Corp.*, 610 F.3d 514 (9th Cir. 2010), the Ninth Circuit recognized that the "'injury required by Article III can exist solely by virtue of statutes creating legal rights, the

United States District Court

For the Northern District of California

1   invasion of which creates standing.'" *Id.* at 516; *see also Robins v. Spokeo, Inc.*, 742 F.3d 409, 413

2   (9th Cir. 2014) ("[T]he violation of a statutory right is usually a sufficient injury in fact to confer

3   standing.").

4          However, the scope of this "statutory right" theory of standing is necessarily limited.  If an

5   alleged violation of a statutory provision was sufficient to create injury in fact for purposes of

6   Article III, the distinction between "statutory" standing and "Article III" standing discussed above

7   would be obliterated.  Thus, in order for there to be standing under the "statutory rights" theory, the

8   statute in question must create the specific right that is allegedly violated and function to create in

9   the plaintiff the right to judicial relief.  *See Tourgeman v. Collins Fin. Servs., Inc.*, — F.3d — , 2014

10  WL 2870174, at *3 (9th Cir. June 25, 2014).  As the Ninth Circuit noted in *Fulfillment Services Inc.*

11  *v. United Parcel Service, Inc.*, 528 F.3d 614 (9th Cir. 2008), "[t]o be certain, not all statutes endow

12  rights on a given plaintiff, the infringement of which is sufficient to support standing."  *Id.* at 619.

13         The Court concludes that Plaintiffs do not have Article III standing to allege an ERISA

14  cause of action for monetary damages simply based on the alleged violation of an ERISA trustee's

15  breach of fiduciary duties.  Courts have expressly rejected the idea that ERISA, in imposing

16  fiduciary duties on Plan trustees, creates statutory rights the violation of which is sufficient to confer

17  standing upon plan participants.

18         For example, in *Kendall v. Employees Retirement Plan of Avon Products*, 561 F.3d 112 (2d

19  Cir. 2009), the Second Circuit addressed an ERISA claim where the plaintiff, on behalf of a class,

20  was seeking to recover accrued benefits that were allegedly unlawfully withheld as well as an order

21  requiring the Plan to "disgorge" ill-gotten gains and earnings.  *Id.* at 116.  The Second Circuit

22  recognized the "statutory rights" principle discussed above, noting that "[t]he actual or threatened

23  injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of

24  which creates standing."  *Id.* at 118.  The court, however, found that plaintiff's ERISA breach of

25  fiduciary duty claim seeking monetary relief did not meet this standard.  It noted there was "no

26  doubt that ERISA imposes on plan fiduciaries a duty to act 'in accordance with the documents and

27  instruments governing the plan insofar as such documents and instruments are consistent with the

28  provisions of [ERISA].'" *Id.* at 120 (quoting 29 U.S.C. § 1104(a)(1)(D)).  But the court then held

that the "statute does impose a general fiduciary duty to comply with ERISA, but it does not confer a right to every plan participant to sue the plan fiduciary for alleged ERISA violations without a showing that they were injured by the alleged breach of the duty." *Id.*  Accordingly, the Court concluded:

> Kendall, however, only alleges that Avon deprived her of her right to a plan that complies with ERISA, deprivations she contends occurred as a result of Avon's breach of its fiduciary duty to comply with ERISA. This argument is obviously circular.  While plan fiduciaries have a statutory duty to comply with ERISA under § 1104(a)(1)(D), Kendall must allege some injury or deprivation of a specific right that arose from a violation of that duty in order to meet the injury-in-fact requirement.  Kendall cannot claim that either an alleged breach of fiduciary duty to comply with ERISA, or a deprivation of her entitlement to that fiduciary duty, in and of themselves constitutes an injury-in-fact sufficient for constitutional standing.

*Id.* at 121.

The Fourth Circuit has similarly rejected the applicability of "statutory right" standing in the context of ERISA breach of fiduciary duty claims.  In *David v. Alphin*, 704 F.3d 327 (4th Cir. 2013), the appellants argued that the "deprivation of their statutory right to have the Pension Plan operated in accordance with ERISA's fiduciary requirements [was] sufficient to constitute an injury-in-fact for Article III standing." *Id.* at 338.  The court rejected this argument, finding that  "this theory of Article III standing is a non-starter as it conflates statutory standing with constitutional standing.  As noted *supra*, these requirements are distinct; we have subject matter jurisdiction over ERISA claims only where the appellants have both statutory *and* constitutional standing." Id.

Although the Ninth Circuit has not addressed this precise issue, at least one district court in this Circuit has found that the reasoning in *Edwards* did not apply to ERISA benefit actions under § 502(a)(1)(B).  *See Spinedex Physical Thereapy, USA, Inc. v. United Healthcare of Arizona, Inc.*, No. CV-08-0457-PHX-ROS, 2012 WL 8147128 (D. Ariz. Oct. 24, 2012).  There, plaintiffs argued that they  had standing to pursue their § 502(a)(1)(B) claim for benefits because "ERISA confers standing 'even in the absence of direct pecuniary harm.'" *Id.* at *2 n.3.  The court rejected this argument finding *Edwards* distinguishable:

> In support, Plaintiffs cite a Ninth Circuit case finding the Real Estate Settlement Procedures Act of 1974 ("RESPA") created a statutory cause of action and a plaintiff need not suffer any harm to pursue a

United States District Court

For the Northern District of California

1              claim. But that type of reasoning has no application in the context of
an ERISA claim for benefits because ERISA itself does not create a
2              cause of action the same way that RESPA does. Unlike RESPA,
ERISA § 502(a)(1)(B) does not *create* a claim (*i.e.*, a statutory injury)
3              which otherwise would not exist; it merely provides that claims for
employee benefits, which would previously would have been
4              presented under common law theories such as breach of contract, are
preempted.

6    *Id.*

7         The Court finds the reasoning of *Kendall*, *David*, and *Spinedex* persuasive and finds the

8    "statutory rights" theory of standing referenced in the Ninth Circuit's *Edwards* case inapplicable to

9    Plaintiffs' ERISA claims seeking monetary relief.[6] Thus, plan participants must have both statutory

10    and constitutional standing to sue for monetary relief.

11         3.    <u>Plaintiffs Have Standing to Pursue Their ERISA Equitable Relief Claims (Causes of</u>

12            <u>Action Two, Five, and Seven)</u>

13         As discussed above, plaintiffs can have standing under ERISA to seek injunctive relief

14    without first showing a direct injury or loss. *See A.F. ex rel. Legaard v. Providence Health Plan*,,

15    2013 WL 6796095, at *6; *see also Shaver v. Operating Engineers Local 428 Pension Trust Fund*,

16    332 F.3d 1198, 1203 (9th Cir. 2003) (finding no showing of loss required where "plaintiffs seek

17    purely equitable relief, either to enjoin future misconduct, or to have the trustees removed").

18    Defendants argue that because Plaintiffs are not seeking "purely injunctive" relief, but have brought

19    ERISA causes of action for monetary damages based on the same facts, they are barred from seeking

20    injunctive relief. The Court disagrees.

21         Defendants are correct that, ultimately, equitable relief under 29 U.S.C. § 1132(a)(3) may

22    not be obtained where a party states a claim under § 1132(a)(1) or § 1132(a)(2). This is because

23    courts have construed § 1132(a)(3) as a "catchall provision" that "act[s] as a safety net offering other

24    appropriate equitable relief for injuries caused by violations that [§ 1132] does not elsewhere

25    remedy." *Varity Corp. v. Howe*, 516 U.S. 489, 518 (1996). Thus, where another provision of

27         [6] As referenced above and discussed in more detail below, courts have found Article III and
28    statutory standing for ERISA *injunctive* relief claims without a plan participant showing of direct
pecuniary harm.

United States District Court
For the Northern District of California

1   ERISA provides an adequate remedy, relief under § 1132(a)(3) is not appropriate. *See Forsyth v.*

2   *Humana, Inc.*, 114 F.3d 1467, 1475 (9th Cir. 2007), *overruled on other grounds by Lacey v.*

3   *Maricopa County*, 693 F.3d 896 (9th Cir. 2012) ("Equitable relief under section 1132(a)(3) is not

4   'appropriate' because section 1132(a)(1) provides an adequate remedy in this case.").

5         However, as Defendants' multiple motions to dismiss make clear, it is sharply contested

6   whether Plaintiffs have *any* remedy under § 1132(a)(2) at all.  It would defy common sense to

7   dismiss Plaintiffs' relief claims at the pleading stage simply because they have also pleaded claims

8   for monetary damages to the Plan under § 1132(a)(2).  It is, therefore, not surprising that another

9   court in this District has squarely rejected Defendants' argument on this point in the context of an

10  action brought under both § 1132(a)(1) and § 1132(a)(3).  In *Ehrman v. Standard Insurance Co.*, No.

11  C06-05454 MJJ, 2007 WL 1288465 (N.D. Cal. May 2, 2007), the defendants argued that "because

12  Plaintiff has asserted a claim to recover benefits pursuant to § 1132(a)(1)(B) . . . he is foreclosed

13  from asserting a claim under § 1132(a)(3)." *Id.* at *3.  The court disagreed, stating:

14        The Court, however, does not agree with Defendants that *Forsyth* and
    *Ford* go so far as to require complete dismissal of Plaintiff's §
15  1132(a)(3) claim at this stage.  The Court does not read *Forsyth* or
    *Ford* to stand for the broad proposition that a Plaintiff may not seek
16  relief under § 1132(a)(3) merely because he or she has also *pleaded* a
    claim under § 1132(a)(1)(B), § 1132(a)(2) and/or other ERISA
17  remedial sections.

18  *Id.* at *4.  The court ultimately held that it was a question for a later stage of proceedings to

19  determine whether, and to what extent, § 1132(a)(3) provided the plaintiff a remedy. *Id.* at *5.

20        The Court agrees with the approach in *Ehrman* and will not foreclose the possibility of

21  equitable relief under § 1132(a)(3) simply because Plaintiffs have also asserted a claim under §

22  1132(a)(2).  Accordingly, the Court finds that Plaintiffs have standing to pursue their equitable relief

23  claim (Counts two, five, and seven).

24        4.    <u>Plaintiffs Have Adequately Alleged Standing for Their First Cause of Action</u>

25        Plaintiffs' first cause of action alleges that the Defendants who have served as trustees for

26  the Pension Fund breached their fiduciary duties with regards to the Longview Construction Loan

27  Fund investment. *See* FAC ¶ 191.  Plaintiffs' factual allegations relating to this investment are

28  sufficient both to state a claim and, at the pleading stage, to establish standing.

1    First, as to standing, Plaintiffs have alleged that the Longview Construction Loan Fund

2  investment resulted in a loss of $50 million to the Pension Fund.  *Id.* ¶ 201.  They further allege that

3  this loss made the "Pension Fund's critical status – current funding is at 67% of accrued obligations

4  for the 2012 year" even "more critical."  *Id.* ¶ 129.  As described above, a trustee's misconduct will

5  give rise to Article III standing where the "[m]isconduct . . . creates *or enhances* the risk of default

6  by the entire plan."  *Fox*, 2013 WL 6439128, at *6 (emphasis added) (citation omitted).  Defendants

7  argue that Plaintiffs have failed to plausibly allege that the $50 million Longview investment loss

8  has created, or enhanced, the risk of default by the Pension Fund.  They point to the fact that while

9  $50 million is not an insignificant amount of money, the Pension Fund has over *$3 billion* in assets –

10  undercutting any contention that such a loss would place the entire Fund at risk.  They further note

11  that the Longview investment coincided temporally with a major global recession and that this,

12  rather than any action or inaction by the trustees, caused the loss.  *See* Docket No. 155, at 6.

13    The Court finds that Plaintiffs have, for purposes of the pleading stage only, adequately

14  alleged standing for their first cause of action.  Plaintiffs have alleged that the Defendant's alleged

15  misconduct caused a substantial loss in Plan assets at a time when the Fund was already in critical

16  condition.  They have alleged a temporal relationship between the making of the Longview

17  Investment and the continued decline in the Pension Fund's funding level.  *See* FAC ¶ 129 (alleging

18  that the Pension Fund's funding was at "67% of accrued obligations for the 2012 year" and was at

19  "70% in 2009").  They have further alleged that as a result of the Fund's critical position, the

20  Defendants have imposed a "Rehabilitation Plan" that has resulted in a decrease in their wages.  In

21  light of these allegations, the Court finds that Plaintiffs have sufficiently alleged that the Longview

22  Investment "enhanced" a risk of default of the Pension Fund.

23    In making this finding, the Court acknowledges that Defendants have made a compelling

24  argument and have highlighted problems that Plaintiffs will have to overcome in order to prevail on

25  their first cause of action.  Plaintiffs have the burden of demonstrating that they have standing at all

26  stages of these proceedings.  *See Kelly v. Echols*, No. CIV-F-05-118 AWI DLB, 2008 WL 4163221,

27  at *6 (E.D. Cal. Sept. 4, 2008).  As the case proceeds, the evidentiary burden on Plaintiffs to

28  establish standing over all causes of action – including the first – will remain and may come into

United States District Court

For the Northern District of California

24

United States District Court

For the Northern District of California

sharper focus.  *See People to End Homelessness, Inc. v. Develco Singles Apartments Assocs.*, 339 F.3d 1, 8 (1st Cir. 2003) ("As litigation progresses, Article III places an increasingly demanding evidentiary burden on parties that seek to invoke federal jurisdiction.  A plaintiff who has standing at the motion to dismiss stage, does not automatically have standing at the summary judgment stage."); *see also Braunstein v. Ariz. Dep't of Transp.*, 683 F.3d 1177, 1184 (9th Cir. 2012) ("Although general allegations of injury can suffice at the pleading stage, the plaintiff must set forth 'specific facts' to survive a motion for summary judgment based on lack of standing.").  The Court questions whether Plaintiffs will be able to establish at the summary judgment stage that a $50 million loss represented a material risk to the health of the Pension Fund such that all Pension Fund plan participants suffered an "injury in fact."  Plaintiffs also face a potential problem in demonstrating that it was the Defendant's alleged misconduct – and not the global recession – that created any risk of default in the Pension Fund.  Nonetheless, these issues are more properly resolved at the summary judgment stage where they can be addressed on a more thorough record.  Thus, for purposes of the pleading stage, the Court finds that Plaintiffs have adequately alleged standing for their first cause of action.[7]

     5.     <u>Plaintiffs' Third, Fourth, and Sixth Causes of Action Are Dismissed for Lack of Standing with Leave to Amend</u>

     Unlike Plaintiffs' first cause of action, Plaintiffs have failed to adequately allege that they have standing to pursue their third, fourth, and sixth causes of action seeking monetary relief under ERISA.  The third cause of action is brought against the H&W Fund trustees for the alleged "no-bid" contract to Hear U.S.A.  The fourth cause of action is brought against all trustee defendants on the basis that they have permitted (1) double-breasting operations and (2) improperly wrote off contributions for employers who were "favorites" of Defendant Burns.  The sixth cause of action is also brought against all trustee defendants, alleging that they routinely permitted Local 3 employees to keep unused "expense" fund monies that properly belonged to the union.

---

[7] Because the Court finds Article III standing sufficiently alleged for the pleading stage, it need not address whether the alleged $2 - $3 an hour payments to the "Rehabilitation Fund" is a sufficient Article III injury in fact in the ERISA context.  The Court leaves this argument for a later date should the parties raise it on a more complete record after discovery.

1    Plaintiffs' allegations are insufficient to establish standing because they do not include

2    factual allegations from which it can be inferred that Defendants' misconduct threatened the

3    Plaintiffs' ability to recover benefits under the various Plans.  Starting with the third cause of action

4    relating to the Hear U.S.A. "no bid" contract, there are simply *no* factual allegations suggesting the

5    contract created or enhanced a risk of the H&W Fund defaulting.  Plaintiffs merely allege, in

6    conclusory fashion, that "the Plan has been harmed and sustained losses, and Plaintiffs' rights to

7    receive benefits under the Plan have likewise been placed more at risk."  FAC ¶ 228.  Such a

8    conclusory statement – while couched as a statement of fact – is little more than a "naked assertion[]

9    devoid of further factual enhancement."  *Blantz*, 727 F.3d at 926.  The allegations, as stated, do not

10   state a plausible claim under *Twombly* and *Iqbal*.  Accordingly, Plaintiffs have insufficiently alleged

11   standing to pursue their third cause of action under 29 U.S.C. § 1132(a)(2).[8]

12   Plaintiffs' fourth and sixth causes of action, like the third cause of action, contain no factual

13   allegations suggesting that the Defendants' alleged misconduct created or enhanced the risk of

14   default in any of the various employee benefit plans at issue in this action.  Rather, both causes of

15   action contain similar conclusory statements regarding the impact of Defendants' alleged conduct.

16   *See* FAC ¶¶ 253, 284.  In addition, these two causes of action are further deficient because of

17   Plaintiffs' failure to differentiate between the various plans.  "Collective" or "group" pleading in a

18   complaint is not *per se* improper and may not, in itself, always be fatal to a claim.  *See, e.g.*, *Howard*

19   *v. Mun. Credit Union*, No. 05-cv-7488, 2008 WL 782760, at *12 (S.D.N.Y. Mar. 25, 2008) ("While

20   Rule 8 does not prohibit 'collective allegations' against multiple defendants, it does require that the

21   allegations be sufficient to put each [d]efendant on notice of what they allegedly did or did not do."

22   (citation omitted)).  However, as one court has noted, "a complaint that repeatedly refers to

23   defendants collectively, without differentiation, is more likely to run afoul of the plausibility

24   standard of *Iqbal* and *Twombly*."  *In re Am. Apparel, Inc. S'holder Derivative Litig.*, CV 10-06576

25   MMM RCX, 2012 WL 9506072 (C.D. Cal. July 31, 2012).  Clarity is necessary to prevent

26

27   _____

     [8] The Court notes that Plaintiffs have not asserted a cause of action under  § 1132(a)(3) for

28   equitable relief based on the alleged no bid contract allegations.  As discussed below, such a claim
     would not face the same standing analysis.

United States District Court
For the Northern District of California

1  conflation of allegations because, as discussed below, Plaintiffs must establish materiality as to each

2  plan allegedly affected.

3  Plaintiffs' fourth and sixth causes of action are brought against the "ERISA Defendants" – a

4  broad group of Defendants who are alleged to be trustees of different employee-benefit Plans (such

5  as the Pension Fund, the H&W Fund, etc.).  As discussed above, in order to have standing under §

6  1132(a)(2), Plaintiffs must demonstrate that their right to receive contributions under a given plan

7  was threatened by the misconduct of that plan's trustees.  This requires a plan-by-plan analysis.  For

8  example, even if the Plaintiffs properly allege that misconduct by the Pension Fund trustees created

9  or enhanced a risk of default by the Pension Fund, this would not be sufficient to show that the

10  misconduct by the *H&W Fund* trustees affected the risk of default by the *H&W Fund*.  Accordingly,

11  Plaintiffs' failure to provide factual allegations as to each set of Plan trustee Defendants and the

12  impact of the alleged misconduct on each Plan is fatal to Plaintiffs' fourth and sixth causes of action.

13  Without *factual* (*i.e.* non-conclusory) allegations as to the (1) the health of each affected

14  Plan and (2) the fiscal impact upon each Plan caused by the misconduct of that Plan's trustees,

15  Plaintiffs have failed to sufficiently allege that the misconduct by that Plan's trustees created (or

16  enhanced) a risk of that Plan defaulting.  Accordingly, Plaintiffs have failed to allege that they have

17  standing to pursue a § 1132(a)(2) claim against any of the "ERISA Defendants" based on the

18  misconduct forming the basis of the fourth and sixth causes of action.  Accordingly these claims are

19  **DISMISSED** with leave to amend.

20  C.   <u>With the Exception of Plaintiffs' First and Second Causes of Action, Plaintiffs' ERISA</u>

21  <u>Causes of Action Fail to State a Claim and Will Be Dismissed with Leave to Amend for</u>

22  <u>Failure to State a Claim</u>

23  As detailed above, Plaintiffs have adequately plead standing as to their ERISA causes of

24  action seeking equitable relief (the second, fifth, and seventh causes of action) as well as the first

25  cause of action seeking monetary relief under ERISA based on the Longview Investment.  However,

26  Defendants also move to dismiss the ERISA causes of action for failure to state a claim.  For the

27  reasons that follow, the Court agrees as to the fifth and seventh causes of action and will dismiss

28

27

these counts with leave to amend.  The motion to dismiss the first and second causes of action, however, will be denied.

Under 29 U.S.C. § 1104, an ERISA fund trustee must act with the

> care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of la like character and with like aims.

29 U.S.C. § 1104(a)(1)(B).  In addition to liability for his own fiduciary duty breaches, a fiduciary can be held liable for *another* fiduciary's liability in three circumstances.  Specifically, § 1105 provides that so-called co-fiduciary liability is appropriate in three circumstances:

- The fiduciary "participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach."  29 U.S.C. § 1105(a)(1).

- The fiduciary has "enabled such other fiduciary to commit a breach" by his "failure to comply with section 1104(a)(1) [setting forth a trustee's fiduciary duties]."  *Id.* § 1105(a)(2)

- The fiduciary "has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."  *Id.* § 1105(a)(3).

Ultimately, however, the existence of a fiduciary duty breach is a necessary pre-requisite to the existence of co-fiduciary liability.  *See, e.g.*, *In re Sprint Corp. ERISA Litig.*, No. 03-2202-JWL, 2004 WL 2182186 (D. Kan. Sept. 24, 2004) ("A necessary predicate for co-fiduciary liability under any of these three subsections is of course that another fiduciary must have committed a breach of fiduciary duty.").

The first and second causes of action both allege that the Pension Fund trustee Defendants breached their fiduciary duty in failing to make any due diligence or reasonable investigation into the Longview Investment.  For example, Plaintiffs allege that the Pension Fund trustees failed to request access to any financial records relating to the Longview Construction Loan Fund, failed to check the status of any of the loans in the Longview Construction Loan Fund portfolio, and generally failed to take steps to verify the solvency of the fund.  FAC ¶ 125.  Rather than independently assess the viability of the investment, the Pension Fund trustees are alleged to have

28

United States District Court

For the Northern District of California

1  simply acquiesced to the "pressure" to approve the investment put on by Defendants Goff and

2  Waggoner – who are alleged to have had a personal connection to the investment through Defendant

3  Waggoner's wife.  *Id.* ¶¶ 126-27.  While a close call given the general nature of some of Plaintiffs'

4  allegations in support of these claims, the Court finds the allegations sufficient to state a claim at the

5  pleading stage and denies Defendants' motion to dismiss the first and second causes of action.

6          However, Plaintiffs' fifth and seventh causes of action – based on the Defendants' alleged

7  permitting of "double-breasting," failure to collect delinquent contributions, and refusing to collect

8  unused expense money – fail to state a claim.  First, one over-arching deficiency in these claims is

9  the fact that there are insufficient factual allegations that the Defendant Trustees knew or should

10  have known of the alleged double-breasting or misconduct relating to the expense money.  *Cf. In re*

11  *First American Corp. Erisa Litig.*, 258 F.R.D. 610 (C.D. Cal. 2009) (noting that as a matter of law

12  fiduciaries can be liable for breach of duties even if unaware of employer's malfeasance "so long as

13  they could have known about it had they acted 'with the care, skill, prudence and diligence under the

14  circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

15  matters would use in the conduct of an enterprise of a like character with like aims'" (quoting 29

16  U.S.C. § 1104(a)(1)(B))).  The complaint merely alleges that all of the Defendants "were aware of

17  it, allowed it, and did nothing afterwards to remedy it" when they were not actively participating in

18  the conduct.  FAC ¶ 137.  However, this general statement is unsupported by factual allegations that

19  would permit the Court to draw this inference.  *Iqbal*, 556 U.S. at 678.

20          Further, with regarding the double-breasted allegations, Plaintiffs generally allege that the

21  "vast majority" of contractors in Hawaii and the Pacific Rim are permitted to operate double

22  breasted.   FAC ¶ 130.  However, there is nothing *per se* unlawful or inappropriate with a contractor

23  having double-breasted operations.  As the Ninth Circuit has stated:

24          Appellants are correct that it may be perfectly legal for a contractor to
           conduct business through a "double breasted" operation, on one in
25          which the same contractor owns both union and non-union companies
           for legitimate business purposes.  In such cases, the collective
26          bargaining agreement of the union firm does not ordinarily apply to
           the non-union firm.

27

28

United States District Court
For the Northern District of California

1    *UA Local 343 United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Industry v.*

2    *Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1469 (9th Cir. 1994).  However, where a non-union company

3    is, in fact, the "alter ego" of the signing company, if the two entities are a "single employer," or if

4    the interests of the two companies are materially inseparable, double-breasted operations may

5    nonetheless give rise to contribution obligations.  *See Trs. of Screen Actors Guild-Producers*

6    *Pension & Health Plans v. NYCA, Inc.*, 572 F.3d 771, 776 (9th Cir. 2009).

7            Thus, Plaintiffs' allegations that double-breasted operations (even widespread double-

8    breasted operations) occur in Hawaii and elsewhere does not plausibly state a claim for relief for

9    breach of fiduciary duties on the part of the "ERISA Defendants."  Instead, Plaintiffs conclusorily

10    allege that "[t]his is not a situation where double-breasting could even potentially be considered

11    permissible under any interpretation of the governing CBA."  FAC ¶ 131.  This conclusory

12    allegation, without any factual enhancement, is insufficient to state a plausible claim for relief.

13    Plaintiffs must plead factual support for its contention that the double-breasted operations in

14    question gave rise to contribution obligations that the Defendants wrongfully failed to recover.

15            Finally, the Court finds the Plaintiffs' collective or group allegations as to these claims to be

16    particularly troublesome.  As discussed above in the standing context, Plaintiffs' complaint

17    implicates multiple employee benefit plans with overlapping, but not identical, sets of trustees.  If

18    the Plaintiffs are alleging that *each* Plan was owed contributions which were improperly waived or

19    not collected, they must alleged factual allegations, going beyond mere conclusions, as to each fund.

20    Further, to the extent they are seeking to hold *all* the trustees of the respective funds liable for the

21    breach they have so pled, they must also allege facts that support the inference that the trustees knew

22    of and participated in (or failed to take efforts to remedy) the breach *or* facts suggesting that the

23    fiduciary's failures to meet their duties *enabled* the breach.  *See* 29 U.S.C. § 1105(a).

24            For the foregoing reasons, Defendants' motion to dismiss Plaintiffs' first and second causes

25    of action is **DENIED**.  Defendants' motions to dismiss Plaintiffs' fifth and seventh causes of action

26    will by **GRANTED** and the claims dismissed, with leave to amend.

27

28

United States District Court

For the Northern District of California

D.      Plaintiffs' Fourteenth Cause of Action Under the LMRDA Is Dismissed with Leave to Amend

Plaintiffs' fourteenth cause of action alleges that the "LMRDA Defendants" violated the LMRDA by requiring employees of Local 3 and the various trusts to "contribute to re-election campaign funds for Russ Burns's slate of candidates." FAC ¶ 160. Plaintiffs also incorporate allegations relating to forced contributions to EPEC/President's Club as well as their allegations that a culture of violence and intimidation pervade Local 3. *Id.* ¶ 360.

Title I of the LMRDA provides "union members with a 'Bill of Rights' designed to guarantee members' ability to participate in union decisions and to protect members' freedoms of speech and assembly." *Pette v. Int'l Union of Operating Engineers*, No. C12-09324 DDP, 2013 WL 5573043, at *4 (C.D. Cal. Oct. 9, 2013). Section 411 of Title 29 generally provides that "[e]very member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings." 29 U.S.C. § 411(a)(1). In addition, it also provides that every labor organization member "shall have the right to meet and assemble with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting." *Id.* § 411(a)(2).

Plaintiffs have failed to adequately state a cause of action under the LMRDA. First, to the extent that they base their claim on the allegations that Defendant Burns has forced Local 3 employees to contribute to his re-election funds under threat of termination, such conduct is not proscribed by the LMRDA. In *Finnegan v. Leu*, 456 U.S. 431 (1982), the Supreme Court held that the termination of union employees for "political" reasons did not violate the LMRDA. The Court held that it was "readily apparent, both from the language of [29 U.S.C. §§ 411(a)(1) and (2)] and from the legislative history of Title I, that it was rank-and-file union members – not union officers or employees, as such – whom Congress sought to protect." *Id.* at 436.

The *Finnegan* Court went on to conclude that union employees who were terminated for failing to have supported the union president did not infringe any right under Title I of the LMRDA. It  noted that the LMRDA does "not restrict the freedom of an elected union leader to choose a staff whose views are compatible with his own" and that there was nothing in the Act which "suggests that it was intended even to address the issue of union patronage.  To the contrary, the Act's overriding objective was to ensure that unions would be democratically governed, and responsive to the will of the union membership as expressed in open, periodic elections."  *Id.* at 441.  Ultimately, the Court concluded by stating:

> No doubt this poses a dilemma for some union employees; if they refuse to campaign for the incumbent they risk his displeasure, and by supporting him risk the displeasure of his successor.  However, in enacting Title I of the Act, Congress simply was not concerned with perpetuating appointed union employees in office at the expense of an elected president's freedom to choose his own staff.  Rather, its concerns were with promoting union democracy, and protecting the rights of union *members* from arbitrary action by the union or its officers.

*Id.* at 442.  Courts, relying on *Finnegan*, have held that the LMRDA simply does not protect an individual's right to *union* employment.  *See, e.g.*, *Franza v. Int'l Bhd. of Teamsters, Local 671*, 869 F.2d 41, 47 (2d Cir. 1989) ("*Finnegan* teaches that it is not a member's *employment by the union* that is protected by Title I; rather it is his *membership in the union* that is safeguarded."); *Eames v. Dennis*, No. 04-CV-894S, 2007 WL 965336 (W.D.N.Y. Mar. 30, 2007) ("[D]ismissal is appropriate because the LMRDA does not protect union employment.").[9]

A number of circuits have recognized an exception to the general rule articulated in *Finnegan* where a plaintiff who has been removed from union employment can "show by clear and

---

[9] The parties dispute the extent to which this District's prior decision in *Hubins v. Operating Engineers Local Union No. 3*, No. C04-3091 MMC, 2004 WL 2203555 (N.D. Cal. Sept. 29, 2004) is on point.  That case involved a state law wrongful termination claim based, in part, on the same alleged Local 3 "forced contribution" scheme.  The plaintiff in that action alleged that Defendant Burns' predecessor as Local 3 business manager had "demoted him, revoked a previously awarded pay raise, and terminated him, in part because of his refusal to make a 'contribution' to [him] and other newly-elected OE3 officials."  *Id.* at *5.  The court determined that plaintiff's state law wrongful termination claim was preempted by the LMRDA.  In so holding, the court cited heavily from *Finnegan* and concluded that "the LMRDA permits a union to terminate confidential union employees for political reasons."  *Id.* at *8.  This decision, while not perfectly on point, at least implies that the "coerced" contributions were not prohibited by the LMRDA.  *Id.* at *8.

United States District Court

For the Northern District of California

1    convincing evidence that his removal was the result of a 'purposeful and deliberate attempt . . . to

2    suppress dissent within the union.'" *Kazolias v. IBEW LU 363*, No. 09 Civ. 7222 (RO)(LMS), 2012

3    WL 6641533, at *17 (S.D.N.Y. Dec. 11, 2012) (quoting *Maddalone v. Local 17, United Bhd of*

4    *Carpenters & Joiners of Am.*, 152 F.3d 178, 184 (2d Cir. 1998)).  This exception is rooted in the

5    idea that the LMRDA rights of " union members to belong to an open democratic labor organization

6    are infringed' when a 'dominant group strives to stifle dissent and efforts at reform' through removal

7    of a political opponent from office." *Maddalone*, 152 F.3d at 178 (quoting *Adams-Lundy v. Ass'n of*

8    *Professional Flight Attendants*, 731 F.2d 1154, 1158 (5th Cir. 1984)).

9            Plaintiffs contend that *Finnegan* is distinguishable because they are not asserting wrongful

10   termination causes of action, nor are they contesting that Defendant Burns may "choose his staff."

11   Docket No. 150, at 29.  Rather, they argue that there is a fundamental difference between "requiring

12   that salaried union employees *campaign* for their union leader" and requiring that employee simply

13   "*kickback a portion of their wages to their union leader's 're-election fund'* in order to keep their

14   jobs."  *Id.* (emphasis in original).  The Court finds that this is a distinction is immaterial under the

15   LMRDA.  Forced donations/contributions and forced campaigning both impinge upon an

16   individuals' free speech and associational rights.  If the latter is not prohibited by the LMRDA, it is

17   difficult to see why the former would be.

18          The FAC merely alleges that Local 3 staff were "forced" to contribute "under threat of

19   termination or loss of their jobs if they failed to contribute."  FAC ¶¶ 160, 161.  The FAC, however,

20   does not allege the forced contributions are part of a purposeful attempt more generally to suppress

21   dissent.  While Plaintiffs argue that the forced contributed "perverts union politics and diminishes

22   union democracy and responsiveness to the will of the union," Docket No. 150, at 28, there are no

23   *factual* allegations in the FAC to support this contention or to demonstrate that the firings at issue

24   are part of an organized scheme to stifle dissent in the union.  Accordingly, the Court need not reach

25   at this time the question of whether any exception to *Finnegan* applies.  Rather, as currently plead,

26   the Court concludes that Plaintiffs' allegations regarding the alleged forced contribution scheme

27   fails to state a claim under the LMRDA.  Again in passing the LMRDA, Congress did not intend to

28   protect an individual's status as a union employee or officer.  *See, e g.*, *Schalk v. Transport Workers*

1    *Union of Am., AFL-CIO*, No. 03 Civ. 8045 (PAC), 2007 WL 1310171, at *4 (S.D.N.Y. May 3,

2    2007).

3          Second, to the extent that Plaintiffs generally allege that Defendants have violated the

4    LMRDA by permitting an environment of threats, extortion, and assaults, the FAC contains

5    insufficient allegations to support this claim.  Allegations that a union member was subject to

6    violence or intimidation for voicing dissent to union policies can support an LMRDA claim.  Thus,

7    for example, in *Kovach v. Turner Dairy Farms, Inc.*, 929 F. Supp. 2d 477 (W.D. Pa. 2013), the

8    district court found that the plaintiff had stated a claim under the LMRDA where plaintiff was

9    subjected to verbal abuse and physical intimidation after opposing a proposal advanced by union

10   leadership.  *Id.* at 490-91.  Plaintiffs' allegations regarding a culture of violence and intimidation,

11   however, involve only two undated incidents.  FAC ¶¶ 164-70.  Plaintiffs do not provide, however,

12   any factual allegations that tie these two incidents to any named Defendant in this action or to

13   demonstrate they were part of a larger pattern designed to suppress dissent.  Rather, Plaintiffs

14   generally allege that one of the instances "would not have been conducted without the advance

15   knowledge and at least tacit approval or acquiescence of Burns" and that Local 3 Defendant Officers

16   "were aware" of the beating.  *Id.* ¶¶ 166, 169.  Such conclusory allegations are insufficient to state a

17   claim.

18          Accordingly, the Court **DISMISSES** Plaintiffs' LMRDA claim with leave to amend.

19   E.    <u>Plaintiffs' Sixteenth Cause of Action Against IOUE, Giblin, and Callahan Alleging a RICO</u>

20         <u>Violation Based on Mandatory EPEC Contributions Are Dismissed with Leave to Amend</u>

21          Defendants IOUE (the national union), Callahan (the current General President of the

22   IUOE), and Giblin (the former General President of the IUOE) have moved to dismiss the sixteenth

23   cause of action asserting a RICO violation under 18 U.S.C. § 1962(c).  This is the only cause of

24   action asserted against these defendants and is based entirely on the allegation that Giblin (and after

25   him, Callahan) unlawfully coerced Local 3 employees to contribute to the EPEC/President's Club

26   PAC.  For the reasons that follow, these Defendants' motion to dismiss is **GRANTED**, but Plaintiffs

27   will be afforded leave to amend.

28

34

United States District Court
For the Northern District of California

1    Under RICO, it is "unlawful for any person employed by or associated with any enterprise

2  engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or

3  participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of

4  racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).  Under this provision, a

5  plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering

6  activity."  *Sanford v. MemberWorks, Inc.,* 625 F.3d 550, 557 (9th Cir. 2010).  Giblin, Callahan, and

7  the IUOE have moved to dismiss this claim arguing that Plaintiffs have failed to allege (1) any

8  predicate racketeering act, let alone a "pattern" of racketeering; (2) have not alleged any operation or

9  management of a "RICO Enterprise," and that (3) no allegations have been made tying any injury to

10  Defendant Callahan's conduct.

11         1.    Plaintiffs Have Failed to Adequately Plead the Existence of a Predicate Racketeering

12               Act for Purposes of RICO

13    For purposes of RICO, "racketeering activity" is "any act indictable under several

14  provisions of Title 18 of the United States Code."  *Turner v. Cook*, 362 F.3d 1219, 1229 (9th Cir.

15  2004).  Relevant to Plaintiffs' allegations in this action, "racketeering activity" can include

16  embezzlement from a labor organization (pursuant to 29 U.S.C.  § 501(c)), extortion (pursuant to 18

17  U.S.C. § 1951), and money laundering (pursuant to 18 U.S.C. § 1957) .  *See* 18 U.S.C. § 1961(1)

18  (defining "racketeering activity" to include violations of 29 U.S.C. § 501(C) – embezzlement from

19  union funds – and 18 U.S.C. 1951 – extortion).

20         a.    Plaintiffs Have Failed to Plead Sufficient Facts Establishing an Extortion

21               Predicate Act

22    Under the Hobbs Act, 18 U.S.C.  § 1951, extortion is defined as the "obtaining of property

23  from another, with his consent, induced by wrongful use of actual or threatened force, violence, or

24  fear, or under color of official right."  *Id.* § 1951(b)(2).  The actual or threatened force need not be

25  physical – threats of economic harm may constitute extortion in certain circumstances.  Specifically,

26  in order to sufficiently allege economic extortion, plaintiffs must show: "(1) a threat of economic

27  harm that is (2) made with the purpose of obtaining money from the victim (3) that puts the victim in

28  reasonable fear of economic harm."  *United States v. Marsh*, 26 F.3d 1496, 1500 (9th Cir. 1994).  In

United States District Court

For the Northern District of California

1    addition, "the fear of economic harm may arise independently of any action by the defendant, and it

2    need not be caused by 'threats of force or violence.'  It is enough if the fear exists and the defendant

3    intentionally exploits it."  *United States v. Williams*, 952 F.2d 1504, 1513-14 (6th Cir. 1991); *see*

4    *also United States v. Lisinski*, 729 F.2d 887, 891 (7th Cir. 1984) ("Exploitation of, or preying upon,

5    the victim's fear constitutes wrongful use of fear and satisfies the statute."); *Accord United States v.*

6    *Crowley*, 504 F.2d 992, 996 (7th Cir. 1974).

7          Plaintiffs have failed to allege sufficient facts demonstrating that IUOE, Defendant Giblin,

8    or Defendant Callahan have engaged in extortion.  Specifically, they have failed to allege that *these*

9    Defendants threatened economic harm or intentionally exploited any individual's fear of economic

10   harm.  Defendant Giblin is alleged to have created the extortionate scheme when he informed the

11   General Executive Board meeting "that all of them and all employees would be required to

12   contribute to the President's Club."  FAC ¶ 106.  It is further alleged that "Mr. Giblin left no room

13   for doubt that the contribution mandate had to be communicated to all local unions and that local

14   union employees had to comply or face harsh consequences."  *Id.*  Finally, it is alleged that Giblin's

15   "enforcer," Defendant James Van Dyke, would "call local union officers if it appeared that there

16   were employees . . . who were not contributing to the President's Club, and demand that the

17   contributions begin immediately."  *Id.* ¶ 108.

18         However, these allegations are too general to support a claim of extortion against the IUOE

19   or Defendant Giblin.  There are no specific allegations that Giblin directed the use of threats of

20   economic harm or intentional exploitation of fear of economic harm against union employees.  The

21   only thing tying Defendant Giblin to any purportedly improper threat of economic harm is the

22   amorphous statement that he left "no room for doubt" that (1) the "mandate" had to be

23   communicated to all employees and (2) non-compliance would be met with "harsh consequences."

24   This statement is insufficient.  Plaintiffs must allege facts from which it can be inferred that

25   Defendant Giblin was involved in the subsequent decision to employ "extortionate threats" to drum

26   up contributions.  As currently alleged, it is just as plausible on the face of the FAC that Defendant

27   Giblin (1) was speaking of expected levels of contributions and that those employees who did not

28   contribute would be the target of potentially uncomfortable – but ultimately non-extortionate –

United States District Court
For the Northern District of California

social pressure or shaming and (2) an overzealous mid-level manager took matters into his own hands and employed the extortionate threats.  *Cf. Metro. Opera Ass'n, Inc. v. Local 100, Hotel Employees & Restaurant Employees Int'l Union*, 239 F.3d 172, 177 (2d Cir. 2001) ("Especially within the labor context, in seeking to exert social pressure on the [Plaintiff] the Union's methods may be harassing, upsetting, or coercive, but unless we are to depart from settled First Amendment principles, they are constitutionally protected.").  The allegations against Defendant Callahan are even more general – it is simply alleged, on information and belief, that when he became General President "he continued to require enforcement of the contribution mandate."  *Id.*  This conclusory allegation is insufficient to establish personal involvement in extortionate activity.

The allegations which do suggest that threats of economic harm were employed simply assert that employees are initially "encouraged to complete" authorization paperwork when they are hired and when "mere encouragement fails . . . the resisting individual is told that they must contribute if they want to keep their job."  *Id.* ¶ 110.  However, there is nothing specifically tying this alleged behavior to Defendant Giblin or Defendant Callahan – rather, this allegation is within a section entitled "GEB Members . . . Implemented the Scheme."  *Id.*  All that is alleged, in Paragraph 114 of the FAC, is that "[f]inancial threats of economic harm and retaliation, in violation of the Hobbs Act, among other laws, were used, at the direction of IUOE and Giblin."  *Id.* ¶ 114.  Similarly, in its opposition to the motion to dismiss on this point, Plaintiffs generally assert that Giblin and Callahan "counseled, commanded, induced or procured the commission of predicate offenses."  Docket No. 149, at 19.  However, such general allegations of "direction," "counseling," "commanding," "inducing," or "procuring," unadorned by any factual support are insufficient to state a claim sufficient to satisfy *Twombly* and *Iqbal*.  *See Blantz*, 727 F.3d at 927.

Accordingly, Plaintiff has failed to plead sufficient specific factual and plausible allegations that the IUOE, Giblin, or Callahan created or engaged in an extortionate scheme.  Plaintiffs will, however, be granted leave to file an amended complaint.

United States District Court

For the Northern District of California

b.   Plaintiffs Cannot Rely on an Embezzlement Theory as a Predicate Act Under 29 U.S.C. § 501(c)

Plaintiffs allege that the coerced payments to EPEC/President's Club also constitute predicate acts for purposes of RICO because they constitute embezzlement of union assets – a violation of 29 U.S.C. § 501(c).  *See* FAC ¶ 406.  To use embezzlement of union assets as a predicate offense, the plaintiffs must show that the defendant is (1) an official or employee; (2) of a labor organization; (3) involved in interstate commerce, and (4) that the funds in question belong to the labor organization.  *United States v. Thordarson*, 646 F.2d 1323, 1336 (9th Cir. 1981).  Defendants argue that the scheme that Plaintiffs allege did not involve the embezzlement of any *union* funds but, at most, involved the coercive taking of funds belonging to the *employees* in the form of mandatory payroll deductions.

The Court agrees.  First, the Court notes that Plaintiffs did not respond to Defendants' arguments regarding the alleged 29 U.S.C. § 501(c) predicate acts in its opposition.  Second, the FAC is replete with allegations that Local 3 *employees* had funds unlawfully taken from them under the alleged mandatory contribution scheme.  *See, e.g.*, FAC ¶ 110 ("The President's Club contributions have at all relevant times been accomplished through compulsory payroll deductions."); *id.* ¶ 398 (noting that "[w]ages paid to members of the Nationwide Employee Class and Local 3 Employee Sub-Class represent their personal, tangible assets subject to conversion"); *id.* ¶ 400 (stating that the EPEC/President's Club scheme "extort[ed] monies from Plaintiffs and the Nationwide Employee Class and Local 3 Employee Sub-Class").  Accordingly, because Plaintiffs do not allege a factual or legal theory under which the alleged mandatory contributions to EPEC/President's Club from employee pay checks resulted in embezzlement or misuse of *union* funds, Plaintiffs' sixteenth cause of action, to the extent it relies on 29 U.S.C. § 501(c) as a predicate, is **DISMISSED** with prejudice.

c.   Plaintiffs' Unlawful Monetary Transaction Predicate Acts (Money Laundering) Rely Entirely on Their Extortion Allegations

Plaintiffs' third theory of predicate act supporting their RICO claim is that each coerced monetary contribution to EPEC/President's Club represented an unlawful monetary transaction/act

United States District Court

For the Northern District of California

1   of money laundering in violation of 18 U.S.C. § 1957.  Section 1957 makes it a crime for an

2   individual to "knowingly engage[] or attempt[] to engage in a monetary transaction in criminally

3   derived property of a value greater than $10,000 and is derived from specified unlawful activity."

4   18 U.S.C. § 1957(a).  Section 1957 is violated where: "(1) the defendant knowingly engaged in a

5   monetary transaction; (2) he knew the transaction involved criminal property; (3) the property's

6   value exceeded $10,000; and (4) the property was derived from a specified unlawful activity."

7   *United States v. Rogers*, 321 F.3d 1226, 1229 (9th Cir. 2003).  The term "monetary transaction"

8   means the "deposit, withdrawal, transfer, or exchange . . . of funds or a monetary instrument . . .  by,

9   through, or to a financial institution."  18 U.S.C. § 1957(f).

10      Plaintiffs' arguments that the forced contributions to EPEC/President's Club is an unlawful

11  monetary transaction necessarily predicated on the conclusion that it was also extortion to force the

12  employees to make the contributions.  If there was no extortion, the subsequent financial

13  transactions of taking the money and placing it in the EPEC fund would not be a transaction

14  involving "criminal property."  Accordingly, Plaintiffs' sixteenth cause of action, to the extent it

15  relies on 18 U.S.C. § 1957 to establish predicate acts of racketeering, is **DISMISSED** with leave to

16  amend.

17      2.   Court Declines to Address Defendant's "Pattern" of Racketeering Arguments at this

18           Time

19      Defendants assert that even if Plaintiffs had adequately alleged *one* predicate RICO act, the

20  FAC insufficiently alleges a *pattern* of racketeering, as required by § 1962.  "A pattern of

21  racketeering activity is defined as at least two instances" of racketeering activity.  *See Gens v.*

22  *Colonial Savings, F.A.*, No. C-11-05526-RMW, 2014 WL 1267050 (N.D. Cal. Mar. 27, 2014).

23  However, "while two predicate acts are required under the Act, they are not necessarily sufficient."

24  *Turner v. Cook*, 362 F.3d 1219, 1229 (9th Cir. 2004).  Rather, "[a] 'pattern' of racketeering activity

25  also requires proof that the racketeering predicates are related and 'that they amount to or pose a

26  threat of continued criminal activity.'"  *Id.* (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S.

27  229, 239 (1989)).  Significantly, "[e]vidence of multiple schemes is not required to show a threat of

28  continued criminal activity, and, indeed, proof of a single scheme can be sufficient so long as the

United States District Court

For the Northern District of California

1  predicate acts involved are not isolated or sporadic." *Id.* (citation omitted); *see also Western*
2  *Associates Ltd. Ptshp. v. Market Square Assocs.*, 235 F.3d 629, 634 (D.C. Cir. 2001) ("It is true that
3  depending on the specific circumstances a single scheme may suffice for purposes of RICO.").

4        Case law suggests that the burden on plaintiffs to plead the "pattern" element is relatively
5  low.  *See, e.g.*, *Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.*, 879 F.2d 10, 18 (2d Cir.
6  1989) ("Hence, the spectre of continuity of criminal offenses in the pattern of activity is sufficiently
7  pleaded to withstand dismissal at this stage of the litigation."); *World Wrestling Entm't, Inc. v. Jakks*
8  *Pacific, Inc.*, 530 F. Supp. 2d 486, 497 (S.D.N.Y. 2007) (noting that "[a]t the pleading stage, the
9  hurdle is relatively low").  Thus, "[a]t the pleading stage, if the threat of continuing racketeering
10 activity is inferable from the complaint, then whether 'defendants' actions are continuing in nature
11 or isolated or sporadic will be the subject of proof at trial.'" *Thai Airways Int'l Ltd. v. United*
12 *Aviation Leading B.V.*, 842 F. Supp. 1567, 1570 (S.D.N.Y. 1994).

13       Despite the relatively low burden, Plaintiffs are advised that in amending the FAC to
14 properly allege predicate acts of racketeering, they should include factual allegations that would
15 permit the Court to infer that the various predicate acts were continuous rather than isolated or
16 sporadic in nature.

17       3.   Plaintiffs' Request for Injunctive Relief Under the Sixteenth Cause of Action Will Be
18            Struck

19       To the extent that Plaintiffs seek injunctive relief under the Sixteenth Cause of Action, this
20 requested relief will be struck.  The sixteenth cause of action is asserted solely by Plaintiff Slack,
21 who is alleged to have retired from Local 3 in 2009.  FAC ¶ 7.  "Plaintiffs must show standing with
22 respect to each form of relief sought." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (2011).  In
23 order to have standing to pursue injunctive relief, Plaintiffs must show a "real and immediate threat
24 of repeated injury in the future." *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 946 (9th Cir.
25 2011) (en banc).  The Ninth Circuit has noted that, in general, a former employee of an organization
26 does not have standing to pursue injunctive relief against his former employer because he "would
27 not stand to benefit from an injunction" prohibiting the challenged conduct. *Walsh v. Nevada Dep't*
28 *of Human Resources*, 471 F.3d 1033, 1037 (9th Cir. 2006).

United States District Court

For the Northern District of California

1    As Plaintiff Slack is no longer employed by Local 3 (and therefore not subject to the

2 challenged contribution scheme), he does not stand to benefit from any injunction.  Accordingly, he

3 lacks standing to assert injunctive relief on behalf of a class, and the request for injunctive relief, to

4 the extent such relief is sought under the sixteenth cause of action, shall be struck.

5    4.    Conclusion

6    For the foregoing reasons, Defendant IUOE, Giblin, and Callahan's motion to dismiss

7 Plaintiffs' sixteenth cause of action is **GRANTED** with leave to amend.  To the extent Plaintiffs

8 seek injunctive relief under the sixteenth cause of action, this is struck for lack of standing on the

9 part of Plaintiff Slack.

10   F.    Plaintiffs' Fifteenth Cause of Action Alleging a RICO Violation Based on Forced

11         Contributions to Defendant Burns' Re-Election Funds Is Dismissed with Leave to Amend

12   Plaintiffs' fifteenth cause of action alleges a RICO violation based on the alleged forced

13 contributions to Defendant Burns' re-election funds.  Plaintiff contends that these forced

14 contributions constituted extortionate activity under the Hobbs Act, 18 U.S.C. § 1961.  As discussed

15 above, in order to establish a predicate act of economic extortion, a plaintiff must show: "(1) a threat

16 of economic harm that is (2) made with the purpose of obtaining money from the victim (3) that puts

17 the victim in reasonable fear of economic harm."  *Marsh*, 26 F.3d at 1500.   In addition, "to qualify

18 as a predicate act under the Hobbs Act . . . the alleged conduct must involve '*wrongful use*' of force,

19 fear, or threats to obtain property."  *United Bhd. of Carpenters & Joiners of Am. v. Building &

20 Const. Trades Dept.*, 911 F. Supp. 2d 1118, 1129 (E.D. Wash. 2012) (quoting 18 U.S.C. §

21 1951(b)(2)). Stated another way, a defendant "is not guilty of extortion if he has a lawful claim to

22 the property obtained."  *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 523 (3d

23 Cir. 1998).

24   In interpreting when economic threats are "wrongful" – that is, whether the defendant has a

25 "lawful claim to the property obtained" – courts have asked whether the "victim received something

26 of value in return for [his] payment" and whether "'the victim [was] entitled by law to be free of the

27 fear he [was] quelling by giving property to the defendant.'"  *Brokerage Concepts, Inc. v. U.S.

28 Healthcare, Inc.*, 140 F.3d 494, 525 (3d Cir 1998) (quoting *Viacom Int'l v. Icahn*, 747 F. Supp. 205,

41

United States District Court

For the Northern District of California

1   213 (S.D.N.Y. 1990)).  The First Circuit has similarly distinguished between "hard bargaining"

2   situations and extortion by examining whether "the plaintiff had a pre-existing statutory right to be

3   free from the defendant's demand."  *George Lussier Enter., Inc. v. Subaru of New England, Inc.*,

4   393 F.3d 36, 50 (1st Cir. 2004).  By contrast, one court has provided an example of a "wrongful"

5   economic threat in the union context: "[E]conomic fear is inappropriate to obtain personal payoffs

6   where, for example, union officials exact payments from employers in return for 'imposed,

7   unwanted, superfluous and fictitious services of workers.'"  *United States v. Vigil*, 523 F.3d 1258,

8   1265 (10th Cir. 2008) (quoting *United States v. Enmons*, 410 U.S. 396, 400 (1973)).

9          Here, Plaintiffs have failed to articulate a theory – either in their opposition to the motions

10   to dismiss or at the hearing – under which it was wrongful or unlawful for the Local 3 Defendants to

11   threaten termination for failing to support Defendant Burns' slate of candidates with a campaign

12   contribution.  Rather, in response to repeated inquiries by the Court during the hearing, Plaintiffs'

13   counsel merely stated that the Hobbs Act made such threats unlawful.  This simply begs the

14   question.  Plaintiffs never adequately addressed the fact that the Hobbs Act *itself* imposes the

15   requirement that the economic threat be wrongful.  *See United Bhd. of Carpenters*, 911 F. Supp. 2d

16   at 1129 (recognizing that "to qualify as a predicate act under the Hobbs Act . . . the alleged conduct

17   must involve '*wrongful use*' of force, fear, or threats to obtain property").

18          Plaintiffs' failure to articulate a theory under which Defendants' alleged threats were

19   wrongful, is complicated by the LMRDA.  Defendants have argued that because "Russell Burns is

20   permitted under the LMRDA to hire and fire appointed Business Representatives and other OE3

21   employees at his discretion," the *threat* of termination cannot constitute a wrongful or unlawful

22   threat for purposes of the Hobbs Act  Docket No. 107, at 21.  As discussed above, the LMRDA has

23   been interpreted as permitting a union official from terminating union employees for political

24   reasons – *including* the failure to affirmatively support the campaign of the official.  *See,* e.g., *Brunt*

25   *v. Service Employees Int'l Union*, 284 F.3d 715, 719 (7th Cir. 2002) ("As president of the Union,

26   Iverson could legally terminate Appellants' employment for their failure to support his re-election.

27   As we stated in *Hodge*, even if Brunt did not openly oppose Iverson's campaign, Iverson was still

28   within the legal boundaries when he discharged her for refusing to support him.").  Courts (including

42

the California Supreme Court) have further interpreted the Supreme Court's holding in *Finnegan* as pre-empting state law causes of action for wrongful discharge in these situations. *See, e.g.*, *Hubins*, 2004 WL 2203555, at *8 ("As the LMRDA permits a union to terminate confidential union employees for political reasons, Hubin's claim for [wrongful termination under California state law] is preempted by [the] LMRDA . . . ."); *see also Screen Extras Guild, Inc. v. Superior Court*, 51 Cal. 3d 1017 (1990) (discussing *Finnegan* at length and concluding that "[w]e are thus compelled to recognize that 'the wide scope of federal regulation of labor unions does not permit [the] application [of all of California wrongful discharge law] to employees of unions'" (alteration in original) (citation omitted)). In *Bloom v. General Truck Drivers*, 783 F.2d 1356 (9th Cir. 1986), the Ninth Circuit found that a California wrongful termination cause of action brought by a former union employee who had been terminated for refusing to illegally alter a meeting's minutes to hide his superior's embezzlement was not prempted. The court stated that the state had a strong interest in prohibiting criminal activity while the LMRDA's federal interest was not implicated in the case. Significantly, the court stated that "Bloom alleges that he was fired, not for political reasons, or for no reason at all, but rather because he refused to illegally alter the minutes of a union meeting. . . . The kind of discharged alleged, retaliation for refusal to commit a crime and breach a trust, is not the kind sanctioned by the Act." *Id.* at 1362. By contrast, in this action, the alleged forced contributions/threatened termination tend to be more along the lines of a threatened "political" termination for failure to provide political support, and is thus arguably permitted under the LMRDA.

On the other hand, at least one Court has disagreed, finding that *Finnegan* provides no bar to state law regulating when, and in what circumstances, a labor union may terminate its employees. *See Ardingo v. Local 951, United Food & Commercial Workers Union*, 333 F. App'x 929 (6th Cir. 2009) ("The fact that the LMRDA does not provide a cause of action to union employees who have been fired for political reasons does not mean that state law could never restrict a union leader's discretion to terminate a union employee.").

Ultimately, the Ninth Circuit has stated: "In the words of Justice Holmes, 'As a general rule, even if subject to some exceptions, what you may do in a certain event you may threaten to do, that

is, give warning of your intention to do in that event, and thus allow the other person the chance of avoiding the consequences.'" *Rothman v. Vedder Park Management*, 912 F.2d 315, 318 (9th Cir. 1990) (quoting *McKay v. Retail Auto. Salesmen's Local Union No. 1067*, 16 Cal2d 311, 321 (1940)). Plaintiffs have failed to explain why, if the LMRDA permits union officials to terminate union employees for political reasons (such as failing to support candidates or positions favored by the union official), the *threat* to do so is wrongful. Stated another way, Plaintiffs have failed to articulate why, under the Hobbs Act, Local 3 employees had a pre-existing right to be free from the demand that they provide material support for Defendant Burns' candidates as a condition of their continued employment.

For the foregoing reasons, Plaintiffs' fifteenth cause of action is **DISMISSED**. The Court will, however, permit Plaintiffs the opportunity to amend their complaint to articulate a factual and legal basis under which the alleged demand that Plaintiffs contribute to Defendant Burns' candidates constitutes extortion.

In amending this cause of action, Plaintiffs are further advised, in addition to the above defect, that they must provide specific factual allegations to support the contention that Defendants in this action made or caused to be made the alleged threats underlying this cause of action. Plaintiffs have merely alleged that Local 3 has a "long history of forcing employees" to contribute to the re-election campaign funds. FAC ¶ 160. It is further alleged that in 2012, $225,000 was "collected from Local 3 staff members under threat of termination" if they failed to contribute. *Id.* Plaintiffs make further reference to "veiled but obvious threats to their employment" and that "Russell Burns devised the Re-Election Fund scheme, disseminated the instruction to implement it in his administration, and ordered the termination of employees who disobeyed him." *Id.* ¶ 375. These allegations are too conclusory to support Plaintiffs' RICO cause of action.

### IV.   CONCLUSION

For the foregoing reasons, the Court rules on the motions to dismiss as follows:

• Defendants' motion to dismiss the first and second causes of action is **DENIED**.

United States District Court
For the Northern District of California

- • Defendants' motion to dismiss the third through seventh causes of action under ERISA is **GRANTED** for lack of standing and failure to state a claim. Plaintiffs are afforded leave to amend these claims.

- • Defendants' motion to dismiss the twelfth and twentieth causes of action for lack of subject matter jurisdiction is **GRANTED** and these claims are dismissed without prejudice.

- • Defendants' motion to dismiss the fourteenth cause of action under the LMRDA is **GRANTED**.  Plaintiffs will be afforded leave to amend these claims.

- • Defendants' motion to dismiss the fifteenth and sixteenth causes of action under RICO is **GRANTED**.  Plaintiffs will be afforded leave to amend these claims.

The Court declines to address Defendants arguments for dismissal as to Plaintiffs' state law causes of action contained in the eleventh and thirteenth causes of action.  First, the Court believes that Plaintiffs' subsequent amendment to their federal claims may affect the factual basis of these state claims.  Second, the Court finds that Defendants' have failed to adequately present any argument as to why these claims should be dismissed.  Conclusory arguments that a Defendant "has no fiduciary duty under § 501" and thus the common law or that the state law cause of action is "preempted by the LMRDA" with little or no case support are insufficient.  This is without prejudice to Defendants properly presenting arguments as to why these claims should be dismissed in any motion to dismiss the second amended complaint which may be filed.

Plaintiffs' second amended complaint shall be filed within 60 days of this order.  To the extent that future motions to dismiss are necessary, the Defendants are instructed to coordinate amongst themselves and to present all arguments in a single motion – as opposed to five separate motions.  Similarly, Plaintiffs will file a single opposition to the motion to dismiss.  The filing of a single omnibus motion to dismiss will aid judicial review and prevent the duplication of arguments across multiple motions or oppositions.  If Defendants seek to file further motions to dismiss, the

parties shall meet and confer to arrive at a stipulation that proposes page limit extensions for both the motion and opposition in light of this Court ordered coordination.

This order disposes of Docket Nos. 99, 106, 107, 109, and 114.

IT IS SO ORDERED.

Dated:  August 19, 2014

_____
EDWARD M. CHEN
United States District Judge