1
2
3
4
5                    UNITED STATES DISTRICT COURT
6                  NORTHERN DISTRICT OF CALIFORNIA
7
8   DAVID SLACK, *et al.*,                 No. C-13-5001 EMC
9           Plaintiffs,
                                           **ORDER GRANTING IN PART AND**
10       v.                                **DENYING IN PART DEFENDANTS'**
                                           **MOTION TO DISMISS**
11  INTERNATIONAL UNION OF
    OPERATING ENGINEERS, *et al.*,         **(Docket No. 187)**
12
13          Defendants.
    _____/
14

15          Plaintiffs are five individuals who are members of Local 3, a local union in the International

16  Union of Operating Engineers ("International Union").  They filed suit against the International

17  Union, Local 3, and a number of individuals affiliated with the unions.  In August 2014, the Court

18  granted in part and denied in part motions to dismiss which challenged Plaintiffs' first amended

19  complaint ("FAC").  *See* Docket No. 176 (order).  The Court gave Plaintiffs leave to amend, and

20  thus, in October 2014, Plaintiffs filed their second amended complaint ("SAC").

21          In the SAC, Plaintiffs have reduced the scope of the litigation.  They now sue, in essence,

22  the Trustees (both union-side and management-side) of three different Trusts: (1) the Health &

23  Welfare Fund ("H&W Fund"); (2) the Pensioned Health & Welfare Fund ("Pensioned H&W

24  Fund"); and (3) the Pension Fund.  In main part, the SAC accuses Defendants of violating ERISA –

25  more specifically, of breaching their fiduciary duties and engaging in prohibited transactions – based

26  on the following: (1) deciding that the Pension Fund should invest in the Longview Ultra

27  Construction Loan Investment Fund, which resulted in a $50 million loss; (2) allowing employers

28  who are signatories to collective bargaining agreements ("CBA") to engage in improper double-

<div style="writing-mode: vertical">**United States District Court**
For the Northern District of California</div>

breasted operations; and (3) allowing employers to write off millions in contributions owed to the Trusts without any legitimate basis.

Defendants have filed a motion to dismiss eight out of the ten claims pled in the complaint. This is the motion currently pending before the Court. Having considered the parties' briefs as well as the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part Defendants' motion.

## I.   FACTUAL & PROCEDURAL BACKGROUND

A.   Plaintiffs

As indicated above, Plaintiffs are all members of Local 3. Each Plaintiff is a participant in one or more of the three Trusts at issue. *See* SAC ¶¶ 9-13. Some Plaintiffs are retired.

B.   Defendants

As indicated above, Defendants are all Trustees of the three Trusts at issue. Defendants can be categorized into two groups: the union-side Trustees and the management-side Trustees. The union-side trustees are all officers in Local 3. *See* SAC ¶¶ 14-24.

| Union-Side Trustees | Management-Side Trustees |
| --- | --- |
| Russell E. Burns | F.G. Crosthwaite |
| Carl Goff | Thomas Holsman |
| Dan Reding | John M. Humber |
| Pete Figueiredo | Richard Piombo |
| Steve Ingersoll | Kevin J. Albanese |

C.   Trustees' Alleged Misconduct

As stated above, the SAC is largely based on the following alleged misconduct by Defendants: (1) deciding that the Pension Fund should invest in the Longview Ultra Construction Loan Investment Fund, which resulted in a $50 million loss; (2) allowing employers who are signatories to CBAs to engage in improper double-breasted operations; and (3) allowing employers to write off millions in contributions owed to the Trusts without any legitimate basis.

D.   Claims

Plaintiffs have asserted the following claims in their SAC:

United States District Court
For the Northern District of California

**(1)    Longview Investment:**

    (a)    **Claim No. 1:** Breach of fiduciary duty and/or engaging in prohibited transactions in violation of ERISA based on the Pension Fund's Longview investment (monetary relief).

    (b)    **Claim No. 2:** Breach of fiduciary duty and/or engaging in prohibited transactions in violation of ERISA based on the Pension Fund's Longview investment (equitable relief).

**(2)    Improper Double-Breasting/CBA Circumvention:**

    (a)    Pension Fund:

        (i)    **Claim No. 3:** Breach of fiduciary duty and/or engaging in prohibited transactions in violation of ERISA based on failure to pursue contributions owed to the Pension Fund as a result of unlawful double-breasting/CBA circumvention (monetary relief).

        (ii)    **Claim No. 4:** Breach of fiduciary duty and/or engaging in prohibited transactions in violation of ERISA based on failure to pursue contributions owed to the Pension Fund as a result of unlawful double-breasting/CBA circumvention (equitable relief).

    (b)    Pensioned H&W Fund:

        (i)    **Claim No. 5:** Breach of fiduciary duty and/or engaging in prohibited transactions in violation of ERISA based on failure to pursue contributions owed to the Pensioned H&W Fund as a result of unlawful double-breasting/CBA circumvention (monetary relief).

        (ii)    **Claim No. 6:** Breach of fiduciary duty and/or engaging in prohibited transactions in violation of ERISA based on failure to pursue contributions owed to the Pensioned H&W Fund as a result of unlawful double-breasting/CBA circumvention (equitable relief).

    (c)    H&W Fund:

United States District Court

For the Northern District of California

1    (i)    **Claim No. 7:** Breach of fiduciary duty and/or engaging in prohibited

2    transactions in violation of ERISA based on failure to pursue contributions

3    owed to the H&W Fund as a result of unlawful double-breasting/CBA

4    circumvention (equitable relief).

5  **(3)    Improper Write-Offs:**

6    (a)    **Claim No. 8:** Breach of fiduciary duty and/or engaging in prohibited transactions in

7    violation of ERISA based on improper write-offs (all three Trusts) (equitable relief).

8  **(4)    Miscellany:**

9    (a)    **Claim No. 9:** Common law breach of fiduciary duty against certain Trustees (the

10    three highest-ranking officers of Local 3) based on, *e.g.*, self-dealing and

11    mismanagement of union assets.

12    (b)    **Claim No. 10:** Violation of the Labor Management Reporting and Disclosure Act

13    ("LMRDA") based on threats made to Plaintiffs as a result of their filing this lawsuit.

14    In the pending motion to dismiss, the claims related to the Longview investment (*i.e.*, the

15  first and second claims) are not being challenged.[1]  All other claims, however, are contested (*i.e.*, the

16  third through tenth claims).

17    In their opposition, Plaintiffs state they are willing to dismiss the ninth claim for relief,

18  although they note that, in the future, they will to seek leave to amend.  *See* Opp'n at 25 ("ask[ing]

19  the Court to dismiss the claim without prejudice"; "Plaintiffs intend, after a notice period, to bring

20  an application to add a Title V LMRDA claim based on facts alleged in the common law breach of

21  fiduciary duty claim").  Based on Plaintiffs' statement, the Court dismisses the ninth claim for relief,

22  without prejudice.  Below the Court addresses the remaining contested claims.

23  ///

24  ///

25  ///

26  ///

27  ───────────────────

28    [1] The motion on its face does refer to a challenge to the second claim for relief, which is
based on the Longview investment, *see* Mot. at 15, but this appears to be an error.

4

**United States District Court**
For the Northern District of California

## II.   DISCUSSION

A.      Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss for failure to state a claim for relief.

> "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." The plausibility standard requires more than the sheer possibility or conceivability that a defendant has acted unlawfully. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Dismissal under Rule 12(b)(6) is proper only when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory.

*Li v. Kerry*, 710 F.3d 995, 999 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79).

B.      Defendants' Arguments

In their motion, Defendants make several arguments: (1) that Plaintiffs have failed to state a claim for relief with respect to the claims for improper double-breasting; (2) that Plaintiffs have failed to state a claim for relief with respect to the claims for improper write-offs; (3) that for both the improper double-breasting and improper write-off claims, Plaintiffs have failed to sufficiently allege the basis for holding *each* Defendant liable; (4) that Plaintiffs lack standing for their monetary relief claims for improper double-breasting and improper write-offs; and (5) that Plaintiffs have failed to state a claim for relief with respect to their claim for violation of the LMRDA.

C.      Claims for Improper Double-Breasting (Claims Nos. 3-7)

Plaintiffs' claims for improper double-breasting are actually based on two different theories: (1) that certain nonsignatory employers should have been making contributions to the Trusts because the nonsignatory employers are actually the alter egos of signatory employers; and (2) that certain signatory employers should have been making contributions to the Trusts based on the work of nonunion employees (which the employers did not) because, though nonunion, the employees still performed covered work as defined by the CBA. In their motion to dismiss, Defendants challenge

both theories.  The Court shall hereinafter refer to these theories as the double-breasting theory and the CBA circumvention theory.

      1.    <u>Double-Breasting Theory</u>

> A double-breasted operation occurs when owners of one company that is a party to a labor agreement [*i.e.*, signatory employer], own a second company that is non-union [*i.e.*, nonsignatory employer].  The non-union company can bid more competitively on jobs that do not require union contractors, while the union company continues to bid on jobs requiring union contractors.

*A. Dariano & Sons, Inc. v. District Council of Painters No. 33*, 869 F.2d 514, 517 (9th Cir. 1989).

In the instant case, Plaintiffs point to several examples of double-breasting by affiliated companies in the SAC.  *See* SAC ¶¶ 61, 63, 65-66, 69, 75-77, 83 (*e.g.*, (1) Bush Construction (union) and Bush Engineering, Inc. (nonunion); (2) Granite Construction, Inc. (union) and Intermountain Slurry Seal, Inc. (nonunion); (3) W.M. Lyles Co. (union), American Paving Co. (union), and Kaweah Construction Co. (nonunion); (4) Giacalone Electrical Services, Inc. (union) and Giacolone Construction or Gilroy Construction, Inc. (nonunion); (5) Richard Lee Construction (union) and Richard Lee Trucking (nonunion)); and (6) Teichert (union) and San Fe Aggregates, Inc. (nonunion)).

At the outset, it should be noted that a double-breasting "operation is not inherently illegal. In particular cases the NLRB has refused either to require the non-union and nonsignatory company to recognize the bargaining representative of the signatory company's employees or to apply the labor agreement to the employees of the non-union, nonsignatory company." *A. Dariano & Sons*, 869 F.2d at 517.

Under Ninth Circuit law, there are two tests used to determine whether the practice of double-breasting is lawful: the single employer test and the alter ego test.  *See id.*  In the instant case, Plaintiffs argue that there is illegal double-breasting under the alter ego test.  They do not invoke the single employer test.  In their motion, Defendants argue that Plaintiffs have failed to make sufficient factual allegations to meet the alter ego test.

United States District Court

For the Northern District of California

The alter ego test has two components: First, as a threshold matter, there must be a showing that the two entities at issue are a single employer.[2]

> The criteria for determining whether two firms constitute a single employer are (1) common ownership, (2) common management, (3) interrelation of operations, and (4) centralized control of labor relations. *No one factor is controlling nor need all criteria be present.* The most important factor is centralized control of labor relations, which can be demonstrated either by showing common control of day-to-day labor matters or by showing that the person in charge of the union company's labor relations made the decision that the second company would be non-union.

*UA Local 343 of the United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Industry of the U.S. & Canada, AFL-CIO v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir. 1994).

Second, to prevail on an alter ego theory, the plaintiff must not only make the threshold showing, but also prove that the nonunion firm "was being used 'in a sham effort to avoid collective bargaining obligations' rather than for the pursuit of legitimate business objectives untainted by 'union animus.'" *Id.* at 1470; *see also Resilient Floor Covering Pension Fund v. M&M Installation, Inc.*, 630 F.3d 848, 852 (9th Cir. 2010) (stating that "[t]he *Nor-Cal* alter ego test requires proof (1) that the two firms have 'common ownership, management, operations, and labor relations,' and (2) that the non-union firm is used 'in a sham effort to avoid collective bargaining obligations'"); *United Ass'n of Journeymen & Apprentices v. Valley Eng'rs*, 975 F.2d 611, 614 & n.6 (9th Cir. 1992) (noting that "alter ego and single employer findings depend on substantially the same considerations," "[t]he four common factors [being]: Interrelation of operations, common management, centralized control of labor relations and common ownership"; but adding that "[a] fifth factor, considered only in alter ego cases, is the intent of the employer").

According to Defendants, Plaintiffs have failed to make sufficient factual allegations on both the single employer threshold and the sham effort showing.

---

[2] The Ninth Circuit has acknowledged that this single employer threshold showing under the alter ego test is "bound to cause confusion" because, aside from the alter ego test, the other way to show an illegal double-breasted operation is under the single employer test. *See S. Cal. Painters & Allied Trades v. Rodin & Co., Inc.*, 558 F.3d 1028, 1031-32 & n.3 (9th Cir. 2009).

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

a.      <u>Single Employer Threshold</u>

The Court rejects Defendants' argument that Plaintiffs have not alleged enough to meet the single employer threshold. For example, Defendants argue that Plaintiffs have failed to make allegations regarding centralized control of labor relations. But, as indicated above, although centralized control of labor relations is the most important factor, the Ninth Circuit has also stated that "[n]o one factor is controlling nor need all criteria be present." *Nor-Cal Plumbing*, 48 F.3d at 1471. Ultimately, the single employer threshold is focused on the issue of control: "is the alleged second business entity under the actual or constructive control of the first company?" *A. Dariano & Sons*, 869 F.2d at 519.

As another example, Defendants contend that Plaintiffs have simply alleged common ownership and common location. But that is not true. Plaintiffs have also alleged, *e.g.*, that there is common management, *see Resilient Floor Covering Pension Fund*, 630 F.3d at 852 (for single employer threshold, asking whether "the two firms have 'common ownership, management, operations, and labor relations'"), and that the signatory and nonsignatory employers do substantially the same work (which is related to the interrelatedness of operations). *See also Flynn v. R.D. Masonry, Inc.*, 736 F. Supp. 2d 54, 63 (D.D.C. 2010) (finding that plaintiffs made adequate factual allegations of alter ego, when they alleged, *inter alia*, that "the defendants have 'common ownership or management, and/or the same or similar employees, customers, and type of work,' and that the RDM defendants have identical street addresses"). A representative allegation in the SAC is as follows: "Bush Construction [union] and Bush Engineering [nonunion] have substantially the same ownership and management (David Bush), do substantially similar construction work, and operate out of the same building." SAC ¶ 61. Although the allegations do not contain greater detail, a reasonable jury could infer from such an allegation that there is centralized control of labor relations on day-to-day labor matters.

In their reply brief, Defendants protest that "to claim that two construction companies perform similar work . . . is largely meaningless because they are both construction companies. The SAC does not allege what kind of construction they perform, the nature of common projects, whether alleged alter egos compete in the same markets, etc." Reply at 2. However, Plaintiffs

United States District Court

For the Northern District of California

1   allege more than performance of similar work; they allege the same management operating out of

2   the same building.  Because details of the precise nature of Defendants' management practice rests

3   solely in the hands of Defendants at this juncture, greater specificity is not required at this pleading

4   stage.  *Cf. Landers v. Quality Communs., Inc.*, No. 12-15890, 2015 U.S. App. LEXIS 1290, at *15,

5   17 (9th Cir. Jan. 26, 2015) (holding that "detailed factual allegations regarding the number of

6   overtime hours worked are not required to state a plausible claim" under the Fair Labor Standards

7   Act; noting that "most (if not all) of the detailed information concerning a plaintiff-employee's

8   compensation and schedule is in the control of the defendants"); *Arista Records, LLC v. Doe 3*, 604

9   F.3d 110, 120-21 (2d Cir. 2010) (noting that the *Twombly/Iqbal* plausibility standard "does not

10   prevent a plaintiff from pleading facts alleged upon information and belief where the facts are

11   peculiarly within the possession and control of the defendant") (internal quotation marks omitted).

12              b.   Sham Effort Showing

13          The problem for Plaintiffs is that, although they have alleged enough to meet the single

14   employer threshold, the alter ego test demands more (at least under Ninth Circuit law) – *i.e.*,

15   Plaintiffs must also show that the non-union firm is being used "'in a sham effort to avoid collective

16   bargaining obligations,' rather than for the pursuit of legitimate business objectives untainted by

17   'union animus.'" *Nor-Cal Plumbing*, 48 F.3d at 1470.  Notably, in *Resilient Floor Covering Pension*

18   *Fund*, the Ninth Circuit underscored that the second part of the alter ego test is independent of the

19   single employer threshold showing:

20              The Pension Fund offers no authority for the proposition that it
               can prevail [under the alter ego test] by merely showing that the
21              non-union employer (Simas) exerted such control and dominion over
               the signatory employer (M&M) and its employees as to be the
22              employer of those employees.  This is just another way of saying that
               the *first* element is met because of common ownership, common
23              management, interrelation of operations, and common control of labor
               relations.

24

25   *Resilient Floor Covering Pension Fund*, 630 F.3d, 853 (emphasis in original).

26          In their papers, Plaintiffs argue that they have alleged enough to meet the second part of the

27   alter ego test simply by making the allegation that "'double-breasting contractors . . . are allowed to

28   run non-union operations within Local 3's jurisdiction in California for the purpose of

9

United States District Court
For the Northern District of California

1  circumventing their CBA.'" Opp'n at 7 (quoting SAC ¶ 50); *see also* SAC ¶ 56 (alleging that "[t]he

2  purportedly separate 'companies' . . . who employ non-union workers in this double-breasting

3  context exist and employ those workers in large part for the purpose of avoiding CBA obligations of

4  signatory contractors"). But this assertion is simply a conclusory allegation that the nonunion firm

5  is being used in a sham effort to avoid collective bargaining obligations. There are no underlying

6  factual allegations to support this conclusion. This SAC in the instant case stands in contrast to the

7  facts in *Rodin*, where there was "no evidence that joint operations between Rodin [nonunion] and

8  SCP [union] were for the purpose of avoiding SCP's obligations under the MLA. Likewise, there

9  [was] no evidence that Rodin diverted union work from SCP at all, let alone that Rodin did so to

10 help SCP avoid SCP's obligations under the MLA. . . . In neither case did jobs go to Rodin that

11 would have gone to SCP." *Rodin*, 558 F.3d at 1033. Similarly, in *Nor-Cal Plumbing*, 48 F.3d at

12 1472, the court noted:

> The appellees presented significant evidence of Elmar Lee Pettit's
> anti-union animus and his intent to avoid the collective bargaining
> agreement with Local 343. Evidence was presented to show that on
> numerous occasions he declared 'I'm gonna close that fucking Union
> shop!' Further evidence was presented that he even told a customer
> that he had to take care to 'conceal his involvement with North Bay
> [nonunion] so that he would not get caught at double breasting.' The
> appellees also presented evidence that Elmar Lee Pettit used North
> Bay to do work that would have been performed by Nor-Cal [union] if
> North Bay had not been created. In fact, their evidence showed that
> several Nor-Cal projects were transferred to North Bay abruptly, in the
> middle of the job. Finally, the appellees presented evidence that
> Nor-Cal stopped bidding on jobs and shut down its operations in 1987.

20 *Nor-Cal Plumbing*, 48 F.3d at 1472.[3]

21      In only one instance did Plaintiffs provide more than just conclusory allegations of sham

22 purpose. These allegations concerned the signatory employer Teichert and the affiliated

23 nonsignatory employer Santa Fe Aggregates, Inc. *See* SAC ¶ 83. But even here the Court concludes

24 that Plaintiffs have not alleged that there was "'a sham effort to avoid collective bargaining

25 obligations.'" *Nor-Cal Plumbing*, 48 F.3d at 1470. In the SAC, Plaintiffs allege that,

26 ———————————————

27      [3] The Court acknowledges that *Rodin* and *Nor-Cal Plumbing* were decided at a different
procedural stage compared to the instant case. Nevertheless, the Court rejects Plaintiffs' suggestion
28 that, at the pleading stage, they may rest on conclusory assertions. This position is directly contrary
to *Iqbal*.

> from time to time Teichert [union] sends its Local 3 member employees to perform highly skilled [work] on non-union Santa Fe projects.  When it does so, in order to hide that it is having union members work on such projects, it pays the Local 3 member employees through Teichert (and makes contributions to the Trusts).  Meanwhile, the employees of its alter ego, Santa Fe – whose work qualifies them to be Local 3 operating engineers subject to Teichert's CBA – are not paid as operating engineers and do not receive fringe benefits like Local 3 members.

SAC ¶ 83.  Although the above allegation indicates that some work was "diverted" from the Teichert (the signatory employer) to Santa Fe (the nonsignatory employer), it cannot be said that this was a sham effort to avoid collective bargaining obligations because, *as alleged*, Teichert actually made contributions to the Trusts for its employees that did work on the Santa Fe projects.  The allegation does not support a claim of an effort to avoid CBA obligations.  While Plaintiffs argued at the hearing that the entirety of the Santa Fe projects should have gone to Teichert in the first place, that is ultimately a challenge to the practice of double-breasting which the Ninth Circuit has held is not inherently illegal.  Santa Fe (a nonsignatory employer) was free to hire whom it wanted, and Teichert (the signatory employer) *did* make contributions for its employees who worked on the Santa Fe projects.

Accordingly, to the extent Claims 3 through 7 are based on Plaintiffs' double-breasting theory, they are dismissed.  The dismissal is with prejudice, particularly as the Court previously gave Plaintiffs leave to amend.  Moreover, Plaintiffs did not offer anything at the hearing to suggest that they would be able to make additional allegations to cure the above-identified deficiencies.

### 2.   CBA Circumvention Theory

As indicated above, the claims for improper double-breasting are also based in part on a theory that does not involve true double-breasting (*i.e.*, two employers) at all.  For the CBA circumvention theory, Plaintiffs focus on only one employer – namely, the signatory employer – and argue that it should  have been making contributions to the Trusts based on the work of nonunion employees because, though nonunion, the employees still performed covered work as defined by the CBA.  Representative allegations as to the CBA circumvention theory are as follows:

- "Rather than double-breasting through an artificial separate company, [CBA signatory] Kroeker simply does not include many classes of employees in union work, such as

mechanics and helpers.  However, . . . there is no carve-out for Kroeker in its CBA that would allow the disparate treatment of covered classes of employees."  SAC ¶ 73.

• "[CBA signatory] Twining conducts union and non-union operations under its name, without even bothering to create a separate alter-ego entity.  All such operations are subject to the CBA and should result in fringe benefit contributions to the Trusts for the workers performing such operations, but Twining simply hires non-union workers as well as union workers, without contributing to the Trusts for the non-Local 3 member employees."  SAC ¶ 81; *see also* SAC ¶ 82 (making the same allegation for CBA signatory Smith-Emery Company).

> As to this theory, Defendants contend that there should be dismissal because there are no alleged facts to support an inference that the non-reported employees of any of the alleged contractors were actually covered by the collective bargaining agreement such that there was a contribution obligation. . . .
>
> Nowhere does the SAC allege facts that would allow the Court to infer that any of the non-reported employees were operating engineers who fall under the MLA. . . .
>
> The allegation that a union employer hires non-union employees is insufficient to support a claim against the Trustees for breach of their fiduciary duties in failing to collect contributions on the non-union employees.

Mot. at 12.

Defendants' argument is not persuasive.  As Plaintiffs contend in their opposition, they have alleged that there are *covered employees* for whom the signatory employer is not making contributions – *e.g.*, "there is no carve-out for Kroeker in its CBA that would allow the disparate treatment of *covered* classes of employees."  SAC ¶ 73 (emphasis added).  As another example: "*All such operations are subject to the CBA* and should result in fringe benefit contributions to the Trusts for the workers performing such operations, but Twining simply hires non-union workers as well as union workers, without contributing to the Trusts for the non-Local 3 member employees."  SAC ¶ 81 (emphasis added).  In their reply brief, Defendants argue that reference to covered operations is immaterial because, "although a collective bargaining agreement may cover an employer's operations, a contribution obligation only arises with respect to *covered employees*."  Reply at 7.

**United States District Court**
For the Northern District of California

1  However, a reasonable inference can be made that Plaintiffs' reference to covered operations also

2  indicates covered employees – *i.e.*, if there is a covered operation, then there are employees doing

3  covered work.

4          Accordingly, to the extent Claims 3 through 7 are based on Plaintiffs' CBA circumvention

5  theory, Defendants' motion to dismiss is denied.

6  D.      Claims for Improper Write-Offs (Claim No. 8)

7          In the eighth claim for relief, Plaintiffs allege that Defendants should be held liable because,

8  in essence, they allowed employers to write off millions in contributions owed to the Trusts without

9  any legitimate basis.  Defendants seek to dismiss this claim because "[c]hoosing not to sue an

10 employer or collect contributions (*i.e.*, to write-off contributions) can be prudent when trustees

11 determine the employer is insolvent or cannot satisfy a judgment."  Mot. at 14.  *See, e.g.*, *Diduck v.*

12 *Kaszycki & Sons Contractors, Inc.*, 8874 F.2d 912, 917 (2d Cir. 1989) ("Here, the Trustees acted

13 prudently when they declined to sue the Kaszycki defendants, recognizing that they were insolvent

14 and could not satisfy a judgment.").  According to Defendants, Plaintiffs should have pled in the

15 SAC factual allegations showing why it was not prudent to do a write-off.

16          Defendants' argument disregards allegations of the SAC which provide, *inter alia*:

17              These write-offs occurred without any substantial or legitimate
                justification that would be consistent with the Trustee Defendants'
18              duties to ensure that fund assets were protected and used solely for the
                benefit of participants and beneficiaries.  *For example, the write-offs*
19              *were not required because the contractors in question were bankrupt*
                *or otherwise unable to satisfy their obligations.*
20

21 SAC ¶ 94 (emphasis added); *see also* SAC ¶ 261 ("[T]here was no legitimate basis to simply write

22 off these debts (as there might be, e.g., where an employer was insolvent and had ceased doing

23 business, and efforts to collect would necessarily be fruitless).").  Thus, Plaintiffs have tendered in

24 the SAC a reason why there should not have been any write-off.

25          The Court also notes that Plaintiffs have made allegations of a gross disparity in write-offs.

26 *See, e.g.*, SAC ¶ 95 ("[I]n or about 2010, all but approximately $40,000 of a $3 million dollar

27 delinquency owed by Richard Lee Construction was written off.").  Taking the allegations of gross

28

United States District Court
For the Northern District of California

1  disparity and no insolvency, a plausible inference can be made that the write-offs were not

2  reasonable.

3      Therefore, Defendants' motion to dismiss Claim No. 8 is denied.

4  E.    Claims Implicating Multiple Defendants (Claims Nos. 3-8)

5      Defendants contend next that Claims Nos. 3-8 (dealing with double-breasting and write-

6  offs) should be dismissed because "the SAC fails . . . to identify with any factual support what each

7  Trustee knew or did." Mot. at 15. Basically, Defendants are making a specificity argument here –

8  *i.e.*, as there are multiple individuals accused of wrongdoing, what exactly did each one do?

9      In assessing Defendants' argument, the Court bears in mind that, under ERISA, a fiduciary

10  can be liable for his or her own breach[4] or, in certain circumstances, for a breach by a co-fiduciary.[5]

11  _____

12  [4] For example, under ERISA, a fiduciary is obligated to

13      discharge his duties with respect to a plan solely in the interest of the
        participants and beneficiaries and –

14  . . . .

15      (B)   with the care, skill, prudence, and diligence under the
              circumstances then prevailing that a prudent man acting in a
16            like capacity and familiar with such matters would use in the
              conduct of an enterprise of a like character and with like aims .
17            . . .

18  29 U.S.C. § 1104(a)(1)(B).

19      [5] Under ERISA,

20      a fiduciary with respect to a plan shall be liable for a breach of
        fiduciary responsibility of another fiduciary with respect to the same
21      plan in the following circumstances:

22      (1)   if he participates knowingly in, or knowingly undertakes to
              conceal, an act or omission of such other fiduciary, knowing
23            such act or omission is a breach;

24      (2)   if, by his failure to comply with section 404(a)(1) [29 U.S.C. §
              1104(a)(1)] in the administration of his specific responsibilities
25            which give rise to his status as a fiduciary, he has enabled such
              other fiduciary to commit a breach; or
26

27      (3)   if he has knowledge of a breach by such other fiduciary, unless
              he makes reasonable efforts under the circumstances to remedy
28            the breach.

**United States District Court**
For the Northern District of California

For the most part, Plaintiffs' theory is that all Defendants knew about the improper double-breasting/CBA circumvention and write-offs but failed to do anything about it. Because the Court has dismissed with prejudice the claims based on the double-breasting theory, the Court need only address Plaintiffs' allegations related to Defendants' knowledge of the CBA circumvention and write-offs.

### 1.   Union-Side Trustee Defendants

Plaintiffs have made sufficient allegations to hold the union-side Trustee Defendants liable. First, as to improper CBA circumvention (*i.e.*, not paying contributions for nonunion employees), Plaintiffs have alleged that the union-side Trustee Defendants knew about the situation because Local 3 organizers reported it to them. *See* SAC ¶ 86 ("The Local 3 officer Defendants were aware of the double-breasting and CBA circumvention because, among other things, organizers whose job [it] is to seek to increase union membership told them about it.").

Second, as to the improper write-offs, Plaintiffs have alleged that the union-side Trustee Defendants knew about them. *See* SAC ¶ 97. While this allegation is admittedly conclusory, a reasonable inference can be made that they had such knowledge because Trustees would likely know about sizable write-offs, especially given the alleged gross disparities mentioned above.

### 2.   Management-Side Trustee Defendants

For the management-side Trustee Defendants, there is similarly a basis for liability with respect to the improper write-offs (*i.e.*, the management-side Trustee Defendants would likely know about sizable write-offs given their status as Trustees).

However, the SAC does not contain sufficient factual allegations to support liability with respect to the circumvention theory. For example, the SAC states that the former Trustees advised Plaintiffs that all Defendants knew about the double-breasting, *see* SAC ¶ 92 – but that is a different theory from CBA circumvention. To the extent Plaintiffs point to the fact that some of the management-side Trustee Defendants were on critical Trust Fund Committees, *see, e.g.*, SAC ¶¶ 90-

---

29 U.S.C. § 1105(a).

Furthermore: "if the assets of a plan are held by two or more trustees[,] each shall use reasonable care to prevent a co-trustee from committing a breach." *Id.* § 1105(b)(1)(A).

United States District Court

For the Northern District of California

1   91 (referring to Executive, Budget & Finance, and Delinquency Trust Fund Committees), one cannot

2   readily infer that failure to pay contributions for nonunion employees would necessarily have been

3   addressed by those committees, particularly since an employer's use of nonunion employees to

4   perform particular work covered by the CBA may not be open and notorious.  As for Plaintiffs'

5   suggestion (at the hearing) that Mr. Crosthwaite (management-side) must have known of the

6   circumvention because of his close relationship with Mr. Burns (union-side), the fact that the two

7   were co-chairmen for the Trust Fund Committees does not mean that all of Mr. Burns's knowledge

8   can thereby reasonably be imputed to Mr. Crosthwaite.  There are no specific factual allegations

9   showing that Mr. Burns's knowledge about CBA circumvention activities was shared with Mr.

10  Crosthwaite; any inference to such effect is speculative.

11          Accordingly, the Court dismisses all CBA circumvention theory claims against the

12  management-side Trustee Defendants for failure to allege with specificity the basis of liability.  The

13  dismissal here is without leave to amend, particularly because, in its prior order, the Court dismissed

14  in part based on insufficient allegations of knowledge.  *See* Docket No. 176, at 29 (order).  If, during

15  the course of this litigation, Plaintiffs should find evidence to support more specific allegations of

16  "knowledge," *see* notes 4-5, *supra*, they may seek leave to amend under Federal Rule of Civil

17  Procedure 15.

18  F.      Standing on Claims for Improper Double-Breasting/CBA Circumvention – Monetary Relief

19          Only (Claims Nos. 3 and 5)

20          Defendants' next argument concerns only Claims Nos. 3 and 5 in the SAC – *i.e.*, the claims

21  for monetary relief based on improper double-breasting/CBA circumvention.  Claim No. 3 relates to

22  the Pension Fund, while Claim No. 5 relates to the Pensioned H&W Fund.[6]  According to

23  Defendants, both these claims should be dismissed for lack of standing.

24          As the Court noted in its prior order, "[t]o establish Article III standing, a plaintiff must

25  show (a) an injury in fact, (2) a sufficient causal connection between the injury and the conduct

26  _____

27          [6] In their brief, Defendants also discuss the H&W Fund but the H&W Fund is not at issue
    with either the third or fifth claim for relief.  While the fifth claim does, in the title for the claim,
    refer to the H&W Fund, that appears to be a mistake.  The body of the fifth claim (as pled in the
28  SAC) addresses the Pensioned H&W Fund only.

United States District Court

For the Northern District of California

1   complained of, and (3) a like[lihood] that the injury will be redressed by a favorable decision."

2   Docket No. 176, at 17 (order).  Here, Defendants challenge injury and redressability.

3         1.   <u>Injury in Fact – Claim No. 5 Only</u>

4         In its prior order, the Court noted that, for Article III standing, a plan participant may not

5   sue for breach of fiduciary duty "unless that breach has caused the plan participant a cognizable

6   injury . . . ."  Docket No. 176, at 18 (order) (emphasis omitted).  The Court also stated that a plan

7   participant has suffered a cognizable injury – *at least where a defined benefit plan is at issue*[7] –

8   where the defendant's conduct "'creates or enhances the risk of default by the entire plan.'"  Docket

9   No. 176, at 18 (order) (quoting *LaRue*, 552 U.S. at 255); *see also David v. Alphin*, 704 F.3d 327, 338

10  (4th Cir. 2013) (stating that "[a] participant in a defined benefit pension plan has an interest in his

11  fixed future payments only, not the assets of the pension fund").  Otherwise, a loss suffered by the

12  defined benefit plan does not affect the plan beneficiary.

13        In the instant case, Defendants seem to argue that Claim No. 5 should be dismissed because

14  Plaintiffs have not adequately alleged that the entire Pensioned H&W Fund is at risk of default as

15  required by the Court's prior order.  *See* Docket No. 176, at 27 (order) (stating that, "[w]ithout

16  *factual* (*i.e.* non-conclusory) allegations as to . . . (1) the health of each affected Plan and (2) the

17  fiscal impact upon each Plan caused by the misconduct of that Plan's trustees, Plaintiffs have failed

18  to sufficiently allege that the misconduct by that Plan's trustees created (or enhanced) a risk of that

19  Plan defaulting").  Defendants emphasize that, in contrast to the numerous risk-of-default allegations

20  related to the Pension Fund (Claim No. 3), *see* SAC ¶¶ 98-112 (over a dozen paragraphs addressing

21  "poor financial condition" of Pension Fund), there are few such allegations for the Pensioned H&W

22  Fund.  *See* SAC ¶¶ 115-17 (only three paragraphs addressing "poor financial condition" of

23  Pensioned H&W Fund).

24

25  ──────────────

26      [7] In the retirement context, the Supreme Court has stated that "[a] 'defined benefit plan' . . .
    generally promises the participant a fixed level of retirement income, which is typically based on the
    employee's years of service and compensation."  *LaRue v. DeWolff, Boberg & Assoc., Inc.*, 552 U.S.

27  248, 250 n.1 (2008).  In contrast, "a 'defined contribution plan' . . . promises the participant the
    value of an individual account at retirement, which is largely a function of the amounts contributed

28  to that account and the investment performance of those contributions."  *Id.*

**United States District Court**
For the Northern District of California

Defendants legitimately argue that there is little in the SAC to substantiate a risk of default to the Pensioned H&W Fund.  The main allegation on the financial condition of the Pensioned H&W Fund is ¶ 115, and it is fairly conclusory.  That being said, Plaintiffs challenge whether they need to plead a risk of default by the entire plan because the SAC now includes allegations suggesting that the Pensioned H&W Fund is not a defined benefit plan in the first place.  *See* Opp'n at 21 n.31 ("Nothing in the SAC establishes that the Pensioned H&W Fund, which retirees are forced to fund in order to obtain necessary health benefits throughout the year, is such a . . . plan."). The Court concludes that Plaintiffs' allegations have raised a fair question as to whether the Pensioned H&W Fund is a defined benefit plan or something akin to a defined benefit plan.  In any event, whether or not the Fund is, as a formal matter, a defined benefit plan is not the critical point. What is important is that Plaintiffs have alleged that, because of Defendants' improper double-breasting/CBA circumvention, the Pensioned H&W Fund is not collecting all the contributions it could, and Plaintiffs, as well as others who are contributing, are "*forced to make up that difference in Pensioned H&W Fund assets with their own higher out-of-pocket payments*."  SAC ¶ 116 (emphasis added).  Such a pocketbook injury directly suffered by Plaintiffs is sufficient to confer standing.  This stands in contrast to the situation where a traditional defined benefit plan is involved; in that instance, the contributing employer, not the employee, bears the risk of misfeasance resulting in financial loss to the fund.  *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999) (stating that an asset pool may be funded by employer or employee contributions, or both, "[b]ut the employer typically bears the entire investment risk and – short of the consequences of plan termination – must cover any underfunding as the result of a shortfall that may occur from the plan's investments").

   2. <u>Redressability – Both Claims Nos. 3 and 5</u>

     a. <u>Claim No. 3</u>

As to Claim No. 3 (namely, the claim for improper double-breasting/CBA circumvention as it relates to the Pension Fund) Defendants actually make more than just a redressability argument. Indeed, they make a preliminary argument that has little to do with standing – *i.e.*, that Plaintiffs' damages claim is speculative and lacking in specificity.  *See* Mot. at 20.  Both of these arguments

18

1    are not convincing.  That Plaintiffs may not know the exact quantum of damages at this juncture

2    does not defeat their claim at the pleading stage.  The point is that they have been injured because

3    the Pension Fund is at risk of default.  Also, that Plaintiffs have not alleged facts such as how many

4    employees worked for the improper double-breasted operations is immaterial.  There is no

5    heightened pleading standard for alleging damages in Plaintiffs' ERISA claim.  To the extent

6    Defendants suggest Plaintiffs must have worked for one of the improper double-breasted operations

7    in order to obtain relief, that is not correct.  Even if Plaintiffs did not work for the entities at issue,

8    that does not mean they were not injured.  The point is that there were contributions that did not go

9    into the Pension Fund, in which Plaintiffs are participants.

10          With respect to Defendants' actual redressability argument, it too is not persuasive.

11   Defendants' main contention is that "*additional participants*" could have an impact on the Pension

12   Fund which Plaintiffs have not taken into account.  Mot. at 20 (emphasis in original).  According to

13   Defendants,

14          additional contributions, whatever they arguably might have been,
            would carry with them additional liabilities to newly-added

15          participants and/or existing participants in the form of benefits accrued
            based on the hours worked for which the contributions were made.

16          The contributions and related liabilities could result in a net gain, be
            cost-neutral, or *even cause the Pension Fund to become more*

17          *underfunded.*

18   Mot. at 20-21 (emphasis in original).  But Plaintiffs point out that the relief they seek from

19   Defendants is simply monetary relief – *i.e.*, they are not asking, as a union might, that nonunion

20   employees become subject to a CBA.  *See* Opp'n at 20.  Therefore, Defendants' point is arguably

21   immaterial.  Moreover, even if the net effect of adding participants were considered, the ultimate

22   financial effect is not an issue subject to resolution on a Rule 12(b)(6) motion to dismiss.

23          Defendants protest that "what Plaintiffs propose is a gigantic windfall where the Funds

24   would bank the recovery and thereby enhance their assets without giving numerous individuals,

25   determined by the Court to be participants, access to benefits which such contributions were

26   presumably intended to fund."  Reply at 11.  But even to the extent this argument has merit, it is in

27   the nature of a set-off argument, and, as such, it would be an affirmative defense.  Plaintiffs need

28   not, at the pleading stage, be obliged to allege facts to meet any affirmative defense.  *See Harris v.*

United States District Court

For the Northern District of California

1  *Amgen, Inc.*, 770 F.3d 865, 883 (9th Cir. 2014) (noting that "a plaintiff need not plead the absence of

2  an affirmative defense, even a defense like exhaustion of remedies, which is 'mandatory'").

3                    b.    Claim No. 5

4        For Claim No. 5, which addresses improper double-breasting/CBA circumvention vis-à-vis

5  the Pensioned H&W Fund, Defendants repeat the same redressability argument as above (*i.e.*, that

6  additional participants means additional liabilities).  For the reasons stated above, that argument is

7  not persuasive.

8        However, Defendants also make a second redressability argument – *i.e.*, that it is entirely

9  speculative that monetary relief would have any impact on (namely, lessen) the premiums that

10  Plaintiffs pay into the Pensioned Health & Welfare Fund.  In support of this argument, Defendants

11  rely on *Glanton v. AdvancePCS, Inc.*, 465 F.3d 1123 (9th Cir. 2006).  There, the plaintiffs were

12  participants in employee welfare benefit plans sponsored by their employers pursuant to which the

13  defendant, a pharmacy benefits management company, paid for participants' prescription drugs with

14  plan assets after accounting for the participants' co-payments.  According to the plaintiffs, the

15  defendant was charging the plans too much for the drugs and secretly "keeping the spread between

16  what it charges the plans for drugs and what it pays suppliers."  *Id.* at 1124.  Plaintiffs alleged that

17  the defendant's overcharging on drugs "caused the plans to demand higher co-payments and

18  contributions from participants" and that, "if their suit [were] successful, the plans' drug costs

19  [would] decrease, and that the plans might then reduce contributions or co-payments."  *Id.* at 1125.

20  The Ninth Circuit held that there was a redressability problem given the facts because "nothing

21  would force" the employers to reduce contributions or co-payments:

22            ALCOA and K-Mart would be free to reduce their contributions or
              cease funding the plans altogether until any such funds were
23            exhausted.  There is no redressability, and thus no standing, where (as
              is the case here) any prospective benefits depend on an *independent*
24            *actor* who retains broad and legitimate discretion the courts cannot
              presume either to control or to predict.
25

26  *Id.* (internal quotation marks omitted) (emphasis added).

27        In their opposition, Plaintiffs argue that there is a material difference between the pending

28  action and *Glanton*.  More specifically, Plaintiffs point out that, in *Glanton*, there was clearly an

*independent actor* involved in the decision-making on contributions; here, "*Defendants* make the relevant decisions about premiums, and the Court plainly has power over them."  Opp'n at 22 (emphasis in original).  In turn, Defendants disagree that *Glanton* was predicated on there being an independent actor involved.  According to Defendants, "the Ninth Circuit did not permit the case to proceed under Article III when in order to do so it must conceive making a finding for plaintiff but must speculate about the actions the ERISA fiduciaries must thereafter take, actions which may not even provide redress to the plaintiff."  Reply at 12.

In support of their position, Defendants cite a district court opinion – *i.e.*, *Fox v. McCormick*, 20 F. Supp. 3d 133 (D.D.C. 2013).  There, the signatory employers had stopped making contributions to a trust fund.  The plaintiffs sued the plan trustees on the basis that they knew about the unpaid contributions but failed to undertake reasonable collection efforts, thereby breaching their fiduciary duty.  *See id.* at 138.  The plaintiffs

> frame[d] the resulting injuries in terms of an alleged reduction of fund assets and their own monthly pension benefits.  Specifically, Plaintiffs contend that uncollected contributions "reduce[d] the financial resources of the [Central Pension Fund]," "depriving the [Fund] of assets owed to the plan."  According to Plaintiffs, this has resulted in a depression of the Benefit Accrual Rate and, ultimately, Plaintiffs' monthly pension benefits.  In other words, Plaintiffs argue that the Fund is diminished and their pension benefits would be greater but for Trustees' failure to collect contributions from [the employers].

*Id.*

The district court concluded that the plaintiffs lacked standing to bring their claim because they had failed to allege that the trustees' failure to collect contributions from the employers deprived the plan of funds so that its risk of default had materially increased.  *See id.* at 142.  The court noted that

> Plaintiffs try to make up for this deficiency by alleging that the Benefit Accrual Rate, and, thus, their pensions, would have increased if Trustees had acted properly and timely pursued the missing contributions.  However, the best they can muster is that a history of period adjustments to the Benefit Accrual Rate makes it "*likely* that [Trustees] will [adjust the Benefit Accrual Rate] again when there is a triggering change in financial health of the Plan.  Plaintiffs essentially concede that a change in the Benefit Accrual Rate is a matter of Trustee discretion and is neither automatic nor guaranteed even if the Central Pension Fund receives additional funding.  Establishing that a judicial decision is likely to redress a claimed injury becomes

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   "substantially more difficult" where the plaintiff, as here, cannot
2   realize remediation of his injury without discretionary intervention by
    an independent actor.  Trustee discretion in setting the Benefit Accrual
    Rate makes Plaintiffs' claims too speculative to support Article III
3   standing.

4   *Fox v. McCormick*, 20 F. Supp. 3d 133, 142 (D.D.C. 2013) (emphasis in original).

5       Defendants are right that *Fox* did not involve an independent actor, and yet the district court

6   still found that there was a lack of standing.  But *Fox* is troubling in that, even in the quote above,

7   the *Fox* court referred to the "independent actor" standard.  Moreover, the case law cited by the *Fox*

8   court (which includes *Glanton*) largely involved an independent actor analysis.  For example:

9   •   In *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (U.S. 1992), the Supreme Court considered

10      standing where the plaintiff was challenging the legality of government action or inaction.

11      The Court noted that, where the plaintiff was himself the object of the government's action

12      (or foregone action), "there is ordinarily little question that the action or inaction has caused

13      him injury, and that a judgment preventing or requiring the action will redress it."  *Id.* at 561-

14      62.  In contrast, when the "plaintiff's asserted injury arises from the government's allegedly

15      unlawful regulation (or lack of regulation) of *someone else*, much more is needed.  In that

16      circumstance, causation and redressability ordinarily hinge on the response of the regulated

17      (or regulable) third party to the government action or inaction – and perhaps on the response

18      of others as well.  The existence of one or more of the essential elements of standing

19      'depends on the unfettered choices made by independent actors not before the courts and

20      whose exercise of broad and legitimate discretion the courts cannot presume either to control

21      or to predict.'"  *Id.* at 562 (emphasis in original).

22  •   In *Loren v. Blue Cross & Blue Shield*, 505 F.3d 598 (6th Cir. 2007), the plaintiffs sued the

23      plan administrator on the basis that it negotiated hospital service rates more favorable to an

24      affiliated company than to the employer-sponsored plans it administered for the plaintiffs'

25      benefit.  *See id.* at 602.  According to the plaintiffs, because the plan administrator charged

26      the employers sponsoring the plans too much for hospital services, this caused the plans to

27      demand higher deductibles, co-payments, and/or contributions from participants.  *See id.* at

28      608.  The Sixth Circuit determined that there was a standing problem because, *inter alia*, the

United States District Court

For the Northern District of California

plaintiffs assumed that the employers "would pass on any increase in reimbursements or administrative fees that may have resulted from [the plan administrator's] alleged wrongful negotiations. *Id.*

Thus, to the extent *Fox* extended the standing analysis beyond the independent actor rationale, it is not supported by any appellate authority and is not persuasive. Furthermore, the Ninth Circuit appears to continue to view *Glanton* as an independent actor case. For example, in *Paulsen v. CNF Inc.*, 559 F.3d 1061 (9th Cir. 2009), the plaintiffs sued, *inter alia*, their former employer with respect to a pension plan in which they were participants. The employer had declared bankruptcy and "distress terminated" the pension plan, which resulted in the Pension Benefit Guaranty Corporation ("PBGC") becoming trustee over the defunct plan. *See id.* at 1066. The Ninth Circuit found a redressability problem, explaining that "any possible recovery on behalf of the CFC Plan must go to PBGC because the CFC Plan does not exist post-termination, or only exists as one of many terminated plans pooled under the auspices of PBGC and funded through PBGC's collective funds." *Id.* at 1073. The court noted that this conclusion was consistent with *Glanton*, which held that, "although plaintiffs suffered a cognizable injury, it was not redressable because nothing would force the plan sponsors to reduce drug prices, contributions, or co-payments." *Id.* at 1073-74. "The [*Paulsen*] Employees are analogous to the plaintiffs in *Glanton* because any recovery, which is payable to PBGC, would not necessarily compel PBGC to increase the benefits paid to the Employees, and we cannot presume to compel such payments." *Id.* at 1074. The Ninth Circuit added: "Despite the fact that PBGC *could* pass along such an additional recovery to the Employees, the ERISA statute does not *compel* PBGC to do so, and we have no mechanism to compel PBGC to pass along the recovery. Therefore, the independent actor barrier to standing applies . . . ." *Id.*

In light of *Paulsen*, the Court rejects Defendants' *Glanton* argument, and thus their redressability argument as well. There is nothing to indicate, at least not at this point, that there was an independent actor involved in the decision-making on contributions. Indeed, as noted above, Plaintiffs contend that "*Defendants* make the relevant decisions about premiums." Opp'n at 22 (emphasis in original).

3.    <u>Summary</u>

Accordingly, the Court rejects Defendants' standing challenge to both Claims Nos. 3 and 5.

G.    <u>LMRDA Claim</u>

The LMRDA provides in relevant part as follows:

> Every member of any labor organization shall have the right *to meet and assemble freely with other members; and to express any views, arguments, or opinions*; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings . . . .

29 U.S.C. § 411(a)(2) (emphasis added).  The Supreme Court has noted that "Congress adopted the freedom of speech and assembly provision in order to promote union democracy" and that Congress "recognized that democracy would be assured only if union members are free to discuss union policies and criticize the leadership without fear of reprisal."  *United Steelworkers v. Sadlowski*, 457 U.S. 102, 112 (1982).

Plaintiffs have asserted a claim under this provision of the LMRDA, both individually and on behalf of a class, against the following Defendants: Mr. Burns, Mr. Goff, Mr. Reding, and Mr. Figueiredo.  Only injunctive relief is sought.  *See* SAC ¶ 300.  The critical allegations underlying the LMRDA claim are as follows:

> 292.    Since the filing of this lawsuit, at Local 3 union meetings in California and Hawaii and in members-only communications on Local 3's website, the LMRDA Defendants have threatened to seek revenge or otherwise retaliate against Plaintiffs in contravention of Plaintiffs' rights to freely express themselves regarding the LMRDA Defendants' illegal conduct, in this instance by setting forth their views in a lawsuit seeking judicial relief.

> 293.    Defendant Reding threatened that Local 3 and its officers would seek and obtain revenge against Plaintiffs at a meeting in Hawaii not long after the instant lawsuit was filed.

> 294.    Defendant Goff made the same threatening and intimidating statements at the union's semi-annual meeting in September, 2014.  These statements were heard by scores of members (and other non-members who should not be present at such a meeting involving private union business, but were).

> 295.    In addition, while Plaintiffs were preparing to file the instant Second Amended Complaint, Defendant Burns made

United States District Court
For the Northern District of California

threatening statements behind the scenes to members, including union employees and former employees, asserting that persons providing information to and/or cooperating with Plaintiffs and their legal team in this matter will be retaliated against, *including by having their pensions taken away*.

SAC ¶¶ 292-95 (emphasis in original).

"To state a cause of action for a violation of [§ 411(a)(2)], a union member must allege facts showing that: (1) he or she exercised the right to oppose union policies; (2) he or she was subjected to retaliatory action; and (3) the retaliatory action was 'a direct result of his [or her] decision to express disagreement with the union's leadership." *Casumpang v. ILWU, Local 142*, 269 F.3d 1042, 1058 (9th Cir. 2001). Given the above standard, Plaintiffs have alleged enough to state a claim under the LMRDA, at least as to Mr. Reding, Mr. Goff, and Mr. Burns. But because Plaintiffs do not appear to have made any specific allegations against Mr. Figueiredo, the LMRDA claim shall be dismissed as to him. As above, the dismissal is with prejudice.

In their papers, Defendants protest that, to state a claim for relief, a "claimant must demonstrate 'a direct infringement of membership rights or a real threat to the democratic integrity of the union.'" *Commer v. Keller*, 64 F. Supp. 2d 266, 270 (S.D.N.Y. 1999). But Plaintiffs have done that here. At the very least, Plaintiffs have alleged a threat to the democratic integrity of the union. As noted above, the Supreme Court has stated that Congress "recognized that democracy would be assured only if union members are free to discuss union policies and criticize the leadership without fear of reprisal." *United Steelworkers*, 457 U.S. at 112. Here, Mr. Reding, Mr. Goff, and Mr. Burns threatened to act against Plaintiffs because of their lawsuit, and a reasonable jury could conclude that a threat would be reasonably likely to deter Plaintiffs, or even other union members, from engaging in protected activity directed at union policies and practices. *Cf. Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000) (in Title VII case, "hold[ing] that an action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity"); *Casumpang*, 269 F.3d at 1058 (analogizing to Title VII in considering what causal connection is required for purposes of a LMRDA claim). That the threats of Mr. Reding, Mr. Goff, and Mr. Burns were not made to Plaintiffs directly, *see* Reply at 14, is not dispositive because, at the very least, Plaintiffs learned of the threats as they were made in public or

United States District Court

For the Northern District of California

quasi-public settings.  Similarly, it should not be dispositive that the threats made – at least by Mr. Reding and Mr. Goff – were somewhat general in nature (*i.e.*, just that they would exact revenge, without the form being specified).

Finally, to the extent Defendants assert that their conduct, as alleged, cannot be the basis for liability under *Finnegan v. Leu*, 456 U.S. 431 (1982), that argument lacks merit.  Defendants suggest that the Court's analysis of *Finnegan* in its prior order is applicable here, but that is a stretch. *Finnegan* concerned actions taken with respect to union employees.  *See also* Docket No. 176, at 32 (order) (noting that the LMRDA does not protect an individual's right to union employment; rather, membership in the union is what is being safeguarded).  Here, although union employees are mentioned in ¶ 295, the focus is clearly on union membership, and not union employment.

## III.   CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to dismiss.  The Court's specific rulings are as follows.

1.     Claims for Improper Double-Breasting (Claims Nos. 3-7).

      a.     Theory of improper double-breasting.  All claims are dismissed with prejudice.

      b.     Theory of CBA circumvention.  These claims survive, except as noted below (see (3)).

2.     Claim for Improper Write-Offs (Claim No. 8).

      a.     This claim survives.

3.     Claims Implicating Multiple Defendants (Claims Nos. 3-8).

      a.     The claims against the union-side Trustee Defendants survive.

      b.     The claims against the management-side Trustee Defendants for improper write-offs survive.  The claims against the management-side Trustee Defendants based on the CBA circumvention are dismissed without leave to amend.

4.     Standing on Claims for Improper Double-Breasting/CBA Circumvention – Monetary Relief Only (Claims Nos. 3 and 5).

      a.     Plaintiffs have adequately pled standing.

5.     Common Law Breach of Fiduciary Duty (Claim No. 9).

1    a.    As Plaintiffs have indicated that they are willing to withdraw this claim, it is

2          dismissed without prejudice.

3  6.    LMRDA Claim (Claim No. 10).

4    a.    This claim survives as to Mr. Reding, Mr. Goff, and Mr. Burns, but not as to Mr.

5          Figueiredo.  The dismissal with respect to Mr. Figueiredo is with prejudice.

6  This order disposes of Docket No. 187.

7

8  IT IS SO ORDERED.

9

10  Dated:  March 16, 2015

11  _____

12  EDWARD M. CHEN
    United States District Judge

13

**United States District Court**
For the Northern District of California