UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID SLACK, et al., <br><br> Plaintiffs, <br><br> v. <br><br> RUSSELL E. BURNS, et al., <br><br> Defendants. | Case No. 13-cv-05001-EMC <br><br> **PUBLIC/REDACTED VERSION** <br><br> **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND DENYING AS MOOT PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION** |

Docket Nos. 259, 268

Plaintiffs in this case are individuals who are members of a local union, more specifically, Local 3 in the International Union of Operating Engineers ("IUOE"). Plaintiffs are participants in a Pension Fund established by the union. At present, there are only two claims remaining in this case. The claims are for violations of ERISA and have been asserted against current or former members of the Board of Trustees for the Pension Fund, based on their decision, as Trustees,[1] to invest $100 million in an investment fund known as the Longview or Ultra Fund. Ultimately, only $90 million was actually invested. Plaintiffs contend that Defendants breached their fiduciary duties (*e.g.*, the duty of prudence and the duty of loyalty) by investing in the Longview Fund.

---

[1] Plaintiffs did not sue all of the Trustees who were involved in the decision. *See* Docket No. 287) (Trento Decl., Ex. 7) (Board minutes of August 20, 2007) (reflecting all Trustees attending the Board meeting). Defendants in this action are named below.

| UNION-SIDE TRUSTEES | MANAGEMENT-SIDE TRUSTEES |
|---|---|
| Russell E. Burns | F.G. Crosthwaite |
| Carl Goff | Thomas Holsman |
| Dan Reding | John M. Humber |
| Pete Figueiredo | Richard Piombo |
| Steve Ingersoll | Kevin J. Albanese |

Currently pending before the Court are two motions for summary adjudication and/or judgment. In their pending motion for summary adjudication, Plaintiffs have moved against 7 out of the 10 defendants – *i.e.*, all Defendants except Mr. Figueiredo, Mr. Ingersoll, and Mr. Albanese. Plaintiffs ask the Court to adjudicate in their favor that these 7 defendants violated their duty of prudence by investing in the Longview Fund. *See generally* 29 U.S.C. § 1104(a)(1)(B) ("[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."). As for the other pending motion, it is brought by all Defendants except Mr. Figueiredo and Mr. Ingersoll, and is one for summary judgment or adjudication based on, *inter alia*, standing, the statute of limitations, and the duty of prudence.

Having considered the parties' briefs and accompanying submissions, the Court hereby **GRANTS** Defendants' motion for summary judgment. More specifically, the Court concludes that there is no genuine dispute of material fact that Plaintiffs' ERISA claims (whether based on the duty of prudence or the duty of loyalty) are time barred. Because the claims are time barred, the Court need not address the remaining arguments made in Defendants' motion. Furthermore, Plaintiffs' motion for summary adjudication is **DENIED** as moot.

## I.  FACTUAL & PROCEDURAL BACKGROUND

The following facts are undisputed.

Amalgamated Bank ("AB") is the investment manager for an investment fund known as the Longview or Ultra Fund.

> The objective of the [Longview] Fund [was] to provide construction loans, generally requiring a term of one to two years and mini-permanent loans generally not exceeding two years from the completion of construction for all types of new construction and substantial remodeling of buildings to be built with 100% union labor. [The] Fund Strategy [was] to provide a high yielding investment alternative while minimizing interest rate risk by lending to short-term construction projects.

Docket No. 272 (Wasnock Decl., Ex. 2) (comparative analysis) (VI000024).

2

United States District Court
For the Northern District of California

In mid-2007, Patty Wagoner, a vice-president of AB, spoke to Mr. Burns, a defendant and one of the union-side Trustees for the Pension Fund, about the Fund investing in Longview. Apparently, Ms. Waggoner's son was, during this time, dating the daughter of Mr. Goff, another defendant and union-side Trustee for the Pension Fund. Mr. Burns directed Ms. Waggoner to the Pension Fund's investment consultant at the time, Scott Whalen of Wurts & Associates, Inc. ("Wurts").

In or about June 2007, Mr. Whalen met with Debbie Nisson, an AB employee and co-manager of the Longview Fund, to talk about Longview. At about this time, Mr. Whalen also talked to another Wurts employee, John Wasnock, about an investigation that Mr. Wasnock previously did on the Longview Fund for a different Wurts client (also a pension fund).

On July 13, 2007, the Pension Fund's Investment Oversight Committee ("IOC") held a meeting during which, *inter alia*, AB gave a presentation on the Longview Fund. The role of the IOC is to advise the Board of Trustees in investments.[2] During the IOC meeting, Mr. Whalen also presented his analysis and recommendation of the Longview Fund. The IOC voted unanimously to recommend a $100 million investment with AB in the Longview Fund.

On August 16, 2007, the IOC met again. For this meeting, the Pension Fund's attorney, Dick Johnson, circulated a memo which addressed documents concerning the Longview Fund and which identified risks with the investment.

On August 20, 2007, the full Board held a meeting during which, *inter alia*, it approved the Longview investment, contingent on a follow-up by Mr. Whalen. All moving defendants, except for Mr. Holsman and Mr. Albanese, were present at this Board meeting. Mr. Whalen (of Wurts) and Mr. Johnson (legal counsel) were also present at the meeting.

On September 4, 2007, Mr. Whalen communicated the results of his follow-up to Mr. Johnson and to the IOC co-chairs at the time (one of which was Mr. Piombo, a defendant).

---

[2] The IOC is a subcommittee of the Pension Fund Board of Trustees and consists of 3 union-side Trustee and 3 management-side Trustees. The Board has "delegated to the IOC primary responsibility for investigating and evaluating investment managers [such as AB] to be considered by the Board." Docket No. 271 (Miller Decl. ¶ 6). "Since its inception the IOC's practice is that no investment may be recommended to the full Board of Trustees unless there is a unanimous decision of the IOC members." Docket No. 271 (Miller Decl. ¶ 6).

3

1   On October 22, 2007, the Pension Fund entered into an Investment Management
2 Agreement ("IMA") with AB, with respect to the Longview Fund.
3   Beginning in October 2007, AB made capital calls on the Pension Fund for the Longview
4 investment. Altogether, AB made six capital calls. The Pension Fund provided capital on all calls
5 except the last.[3]
6   The last capital call was made in or about February 2009. At that time, IPS – the Pension
7 Fund's investment consultant, hired after Wurts was terminated, *see* note 3 – recommended that
8 the capital call not be met. IPS made this recommendation because the Longview Fund "fell
9 within the Pension Fund's fixed income asset class, and because the Pension Fund was
10 overweighted in fixed income investments." Docket No. 274 (Sichel Decl. ¶ 15). The question of
11 whether the Pension Fund could refuse to make the capital call was referred to the Pension Fund's
12 legal counsel, Mr. Johnson. Apparently, Mr. Johnson opined that the Pension Fund did not have
13 to meet the last capital call, but his reasoning as to why is not entirely clear.[4] An e-mail written by
14 Mr. Johnson during the relevant time period states as follows:



---

[3] Shortly after the third capital call, the Pension Fund terminated Wurts as its investment consultant and hired Investment Performance Services, Inc. ("IPS") in its place.

[4] Mr. Johnson is now deceased.

4

1
2
3  Docket No. 303-4 (Leviant Reply Decl., Ex. UUU) (e-mail) (filed under seal).  An e-mail authored
4  by IPS during the relevant time period states that,
5
6
7
8          Docket No. 303-4 (Leviant Reply Decl., Ex. SSS) (e-mail) (filed under seal).
9          Subsequently, in May 2009, the Pension Fund wrote a letter to AB, informing AB that the
10 Fund would not make the capital call.  In the letter, the Pension Fund noted that Schedule A of the
11 IMA

> refers to an investment of "approximately" $100,000,000.  Currently the Pension Fund has invested about $90,000,000 in the [Longview] Fund.  The Pension Fund believes that under the current circumstances it is not legally obligated to proceed with the $10 million capital call, and the Fund's investment consultant has advised that you have not provided any documentation confirming that there is such a legal obligation.

Docket No. 299 (Weiss Decl., Ex. LLL) (letter).

## II.   DISCUSSION

A.   Legal Standard

Under Federal Rule of Civil Procedure 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of evidence … will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Id.* at 252.  At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor.  *See id.* at 255.

The Court has before it competing summary judgment motions.  The motions overlap on

one issue only – *i.e.*, whether Defendants breached their duty of prudence in approving the Longview investment. Defendants' motion brings up two additional issues, namely, whether they are entitled to summary judgment based on standing and the statute of limitations. These latter issues cover not only the claims for breach of the duty of prudence but also the claims for breach of the duty of loyalty.

"Where the party moving for summary judgment does not bear the burden of proof at trial, it may show that no genuine issue of material fact exists by demonstrating that 'there is an absence of evidence to support the non-moving party's case.'" *Gonzales v. Arrow Fin. Servs. LLC*, 489 F. Supp. 2d 1140, 1144-45 (S.D. Cal. 2007) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

In contrast, "'[i]f the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor.'" *Id.* at 1145 (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)).

B.   Statute of Limitations

As noted above, one of the grounds for Defendants' motion for summary judgment is that Plaintiffs' claims are time barred. As the statute of limitations defense is an affirmative defense, Defendants bear the burden of proof on this issue. *See Tibble v. Edison Int'l*, No. CV 07-5359 SVW (AGRx), 2009 U.S. Dist. LEXIS 120939, at *28 (C.D. Cal. June 30, 2009).

The statute of limitations for the kind of ERISA violations asserted herein (*i.e.*, breach of fiduciary duty) is provided for in 29 U.S.C. § 1113. Section 1113 states as follows:

> No action may be commenced under this title with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part [29 U.S.C. §§ 1101 et seq.], or with respect to a violation of this part [29 U.S.C. §§ 1101 et seq.], after the earlier of –
>
> (1)   six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or
>
> (2)   three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

6

>  except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113.

Plaintiffs initiated this lawsuit on October 27, 2013. Plaintiffs have not argued against a time bar based on the three-year statute of limitations provided for in subsection (2) above. Thus, the Court is limited to considering only the six-year statute of limitations provided for in subsection (1) above.

With regard to subsection (1), Plaintiffs are not relying on an omission theory, *e.g.*, with respect to monitoring the investment after the Fund entered into the IMA. *See* Reply at 30 n.44 (disavowing a claim of failure to monitor the Longview investment). The focus instead is on the decision to invest and the actual investment in response to capital calls. Therefore, the only question here is whether "the date of the last action which constituted a part of the breach or violation" took place on or after October 27, 2007. *Id.* § 1113(1)(A). Defendants argue that the date of the breach was, at the latest, on October 22, 2007, when the Pension Fund entered into its contract with AB to act as investment manager for the Longview Fund. In contrast, Plaintiffs argue that the date of the breach was when the Board actually invested money in the Longview Fund – *i.e.*, when the Board met the capital calls issued by AB – all or most of which took place after October 27, 2007.[5]

Plaintiffs' position is problematic for several reasons. First, in the SAC, Plaintiffs allege that "[t]he Pension Fund Trustees breached their fiduciary duties under ERISA § 404 by agreeing to invest $100,000,000 in pension fund monies, and actually investing $90,000,000 without proper due diligence, in the Longview investment." SAC ¶ 168 (emphasis added). Plaintiffs focus on the words "actually investing $90,000,000" but it is the subsequent phrase "without proper due

---

[5] In the operative second amended pleading, Plaintiffs allege that "[t]he Pension Fund Trustees breached their fiduciary duties under ERISA § 404 by [1] agreeing to invest $100,000,000 in pension fund monies, and actually investing $90,000,000 without proper due diligence, in the Longview investment and by, [2] thereafter, failing to take steps to recover the lost $47 million." SAC ¶ 168. Plaintiffs seem to have abandoned a claim for breach based on (2). At the very least, Plaintiffs made no argument related to the statute of limitations based on (2) and, therefore, the Court deems any such argument waived.

7

diligence" that is telling. The failure to do due diligence was in conjunction with the investigation of AB and the Longview Fund; this alleged failure in the SAC took place *prior* to the decision to enter into the IMA with AB on October 22, 2007. *See, e.g.*, SAC ¶ 166 (alleging that, "after undertaking no true due diligence or reasonable investigation of their own, Defendants agreed to invest $100 million of Pension Fund assets"); *cf. David v. Alphin*, 704 F.3d 327, 341 (4th Cir. 2013) (noting that the plaintiffs "have not claimed that the bank-affiliated funds *became* imprudent [after initial selection]"; "[t]he TAC makes clear that the challenge to the prudence of the funds . . . is based on attributes of the funds that existed at the time of their initial selection" and so "the claim is not truly one of a failure to remove an imprudent investment") (emphasis in original).

Second, Plaintiffs' position is dependent on the actual investment of money being a fiduciary act, rather than just a ministerial one (*i.e.*, an act carrying out the earlier fiduciary decision to enter into the IMA). That is, according to Plaintiffs, under the IMA, the Pension Fund did not have a legal obligation to invest in the Longview Fund; rather, the Pension Fund had discretion, even after entering into the IMA, as to whether to make an investment (if any) and that discretion was not actually exercised (and thus there was no breach of fiduciary duty) until the money was transferred to AB. Plaintiffs point out that the IMA contains the following provision: "The Client hereby appoints AB as custodian, trustee, and managing agent with respect to all funds of the Trust which the client may from time to time *in its sole discretion* transfer to AB under this Agreement." Docket No. 260-5 (Weiss Decl., Ex. U) (IMA ¶ 1) (emphasis added).

The Court is not persuaded by Plaintiffs' interpretation of the IMA. Although ¶ 1 of the IMA does contain the above statement, Plaintiffs ignore the subsequent provision in the IMA that "Client has *committed* to invest a total of $100,000,000 (approximately) in one or more installments to be callable by AB with not less than thirty days prior written notice to Client." Docket No. 260-5 (Weiss Decl., Ex. U) (IMA, Schedule A) (emphasis omitted and added). The term "committed" clearly implies a legal obligation. To the extent there appears to be a conflict between ¶ 1 and Schedule A, "when a general and [a] particular provision [in a contract] are inconsistent, the latter is paramount to the former." Cal. Code Civ. Proc. § 1859. The specific commitment language in Schedule A thus overrides any apparently contrary language in ¶ 1 of the

1  IMA. *See also Employers Reins. Co. v. Superior Court*, 161 Cal. App. 4th 906, 919 (2008)
2  (noting that language in a contract is interpreted in context; a provision is not interpreted in
3  isolation). Moreover, the Disclosure Statement for the Longview Fund includes a provision
4  requiring a participant in the Longview Fund to give twelve months' notice in order to withdraw
5  (which notice was never given by the Pension Fund herein), *see* Docket No. 286 (Trento Decl.,
6  Ex. 4) (Disclosure Statement at 21); this provision clearly contemplates that the Pension Fund
7  could not unilaterally refuse a capital call without complying with the twelve-month notice
8  requirement.

9  Even if the two above-cited provisions in the IMA gave rise to an ambiguity as to whether
10 the Pension Fund was legally obligated to contribute approximately $100 million to the Longview
11 Fund, the Court may still look to extrinsic evidence such as course of performance. *See* Cal. Code
12 Civ. Proc. § 1856(c) (providing that "[t]he terms set forth in a writing described in subdivision (a)
13 [*i.e.*, a writing intended by the parties as a final expression of their agreement] may be explained
14 or supplemented by course of dealing or usage of trade or by course of performance").

> The rationale for the admission of course of performance evidence is a practical one. "[W]hen a contract is ambiguous, a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the court. The reason underlying the rule is that it is the duty of the court to give effect to the intention of the parties where it is not wholly at variance with the correct legal interpretation of the terms of the contract, and a practical construction placed by the parties upon the instrument is the best evidence of their intention."

*Employers Reins. Co. v. Superior Court*, 161 Cal. App. 4th 906, 921 (2008).

Here, the Pension Fund's course of performance in response to AB's capital calls indicated that the Board (acting on behalf of the Pension Fund) understood that the Fund had a legal obligation to meet the capital calls. On five different occasions, the Pension Fund satisfied the capital calls and nowhere in the Board minutes is there a suggestion that the Board was exercising discretion in satisfying the capital calls as opposed to simply carrying out the earlier decision and commitment to invest in the Longview Fund. Indeed, as reflected in the Board minutes, the only discretion that the Board (acting on behalf of the Fund) exercised was in deciding from which

9

source the money would come to meet the capital calls. *See, e.g.*, Docket No. 303-4 (Leviant Reply Decl., Ex. VVV) (draft IOC minutes of June 11, 2008) ("A motion was made, seconded and carried to approve *the moving of $14 million out of* the Sands Capital Management profile to the Longview Capital Ultra-Construction Fund. IPS will work with Fund Manager to move assets by June 27, 2008.") (emphasis added); Docket No. 299 (Weiss Reply Decl., Ex. WWW) (Board minutes of October 27, 2008) ("A motion was made, seconded and carried to approve the funding of the $10 Million capital call by the [AB Longview] Fund *by pulling $3 Million from* Income Research & Management and $7 Million from the McMorgan.") (emphasis added). It was not until the last capital call, that the Board engaged its attorney to see if there was a legal way out to escape the capital call for $10 million.

Finally, the Court takes note that the construction of the IMA proposed by Plaintiffs – namely, that, under the IMA, the Pension Fund could decide if and when to invest in the Longview Fund – would effectively render the IMA an illusory contract or at best an option in the Pension Fund's favor. *See Third Story Music, Inc. v. Waits*, 41 Cal. App. 4th 798, 805 n.4 (1995) (noting that an illusory promise is one containing words "in promissory form that promise nothing" and which "do not purport to put any limitation on the freedom of the alleged promisor"; adding that "[t]he tendency of the law is to avoid the finding that no contract arose due to an illusory promise when it appears that the parties intended a contract") (internal quotation marks omitted); *see also Peleg v. Neiman Marcus Grp., Inc.*, 204 Cal. App. 4th 1425, 1438 (2012) (stating that "[w]ords of promise which by their terms make performance entirely optional with the promisor . . . do not constitute a promise"; adding that "[o]one of the most common types of promise that is too indefinite for legal enforcement is the promise where the promisor retains an unlimited right to decide later the nature or extent of his or her performance" as "[t]his unlimited choice in effect destroys the promise and makes it illusory") (internal quotation marks omitted). It is hard to imagine, however, how a fund like the Longview Fund could operate with any stability or predictability if the source of its capital needed to fund construction loans it were subject to investors' exercise of unbridled discretion in deciding whether to respond to a capital call. That is why there is the twelve-month notice requirement for withdrawal discussed above.

10

Plaintiffs protest that the Pension Fund did not have a legal obligation to meet the capital calls as evidenced by its decision not to satisfy the last capital call. But this argument suffers from several flaws. First, contrary to what Plaintiffs suggest, Mr. Johnson, the Pension Fund's attorney, never clearly opined that the Pension Fund did not have such a legal obligation. At best, he indicated that it was ambiguous whether the Fund had an obligation, and the letter that the Pension Fund sent AB largely rested on the interpretation that, even if there were a legal commitment, the Fund had met that legal commitment by providing $90 million, which was "approximately" $100 million. Second, even if Mr. Johnson was of the clear opinion that the Pension Fund did not have a legal obligation to satisfy any capital calls, Mr. Johnson's opinion is not binding on this Court. Indeed, for the reasons stated above, it would be wrong. Finally, Plaintiffs' argument is based on a course-of-performance theory but, as indicated above, the course of performance focuses on how the parties conducted themselves *prior* to any dispute about the meaning of the contract; in this case, the course of performance supports the conclusion that the IMA was binding and the subsequent investments in response to capital calls were not discretionary decisions constituting new and independent breaches of fiduciary duty.

Accordingly, the Court concludes that, in spite of Plaintiffs' attempt to characterize the breach as the actual transfer of money to AB, the "true" breach was Defendants' decision to approve, without exercising the requisite due diligence of a prudent investigation,[6] the Longview investment and relationship with AB in the first place, which was consummated at the latest on October 22, 2007, when the IMA with AB was signed.

Left with this predicament, Plaintiffs' final contention is that their theory of co-fiduciary liability gets them around any time bar.[7] Liability for the breach of a co-fiduciary is governed by

---

[6] *See, e.g.*, SAC ¶ 44 (alleging that Defendants should have "check[ed] on the status of a sample of loans in the portfolio" and that Defendants "failed to request and obtain loan status guarantees from [AB], to contact any recipients of Longview Construction Loan money, or to request (and obtain) from [AB] any access to financial records showing payments by recipients of the funds invested in the Longview Construction Loan Fund").

[7] At the hearing, Plaintiffs suggested that Defendants failed to give adequate notice that they were moving for summary judgment on Plaintiffs' co-fiduciary liability theory. However, it is clear from Defendants' motion that they were moving for summary *judgment* (not adjudication) based on statute-of-limitations grounds. In any event, Plaintiffs did make an argument on the statute of

11

29 U.S.C. § 1105(a), which provides as follows:

> (a) Circumstances giving to liability [for breach by co-fiduciary]. In addition to any liability which he may have under any other provision of this part [29 U.S.C. §§ 1101 *et seq.*], a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2) if, by his failure to comply with section 404(a)(1) [29 USCS § 1104(a)(1)] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105(a).

In the instant case, Plaintiffs' SAC recites all three grounds above to support their co-fiduciary liability theory, *see* SAC ¶¶ 168-69, but, to avoid the time bar, Plaintiffs' invoke only the third ground above under § 1105(a)(3) – *i.e.*, that "Defendants are liable for each other's breaches as co-fiduciaries under ERISA § 405(a)(3) for failing to take steps to remedy those breaches." Reply at 29 n.41. This makes sense because, as the true breach by Defendants was their approval of the IMA, signed on October 22, 2007, for Plaintiffs to get around the statute of limitations (*i.e.*, to put at issue the time period on or after October 27, 2007), they must point to failures to take action after the IMA was signed.

But Plaintiffs' co-fiduciary liability theory founders, because under § 1105(a)(3), a fiduciary is liable for failing to take steps to remedy a co-fiduciary's breach only if the fiduciary has *knowledge* of the co-fiduciary's breach in the first instance. Here, Plaintiffs have offered no evidence suggesting that, *e.g.*, any defendant knew that another defendant had not done a prudent investigation of AB and the Longview Fund. Nor have Plaintiffs offered evidence that it should have been obvious that any defendant had not done a prudent investigation of AB and the

---

limitations for their co-fiduciary liability theory as a part of their opposition to Defendants' motion. *See* Reply at 29 n.41.

12

Longview Fund. There is, for instance, no evidence that Defendants discussed with one another what investigation he had done prior to voting on the Longview investment. In fact, as it turned out, at least one defendant (Mr. Burns) was exposed to an additional presentation about the Longview Fund from AB and spoke to a representative from a different pension fund about that fund's successful investment in the Longview Fund. *See* Docket No. 275 (Burns Decl. ¶¶ 11, 13).

Finally, it is worth noting that Plaintiffs' co-fiduciary liability is problematic because, although Plaintiffs now focus on the underlying breach by the co-fiduciary as a breach of the *duty of prudence*, the SAC's allegations are primarily targeted at a different breach and by one co-fiduciary alone, *i.e.*, Mr. Goff (see SAC ¶¶ 168-69 as to co-fiduciary liability). That is, Plaintiffs' position, as articulated in the SAC, was that the other Trustees were liable for Mr. Goff's breach of his fiduciary duties, and Mr. Goff's breach, in particular, was that of his *duty of loyalty – i.e.*, he approved the Longview investment because of his relationship with Ms. Waggoner and not because of the investment's independent merit. Notably, there is no evidence that the management-side Trustees even knew about the relationship between the Goffs and the Waggoners. While the union-side Trustees had knowledge that the children of Mr. Goff and Ms. Waggoner were dating, there is no evidence that they *knew* (as knowledge is required under § 1105(a)(3)) Mr. Goff was approving the Longview investment based on that relationship and not based on the investment's independent merit. *See* SAC ¶¶ 168-69.

### III.  CONCLUSION

For the foregoing reasons, the Court concludes that there is no genuine dispute of material fact that Plaintiffs' first and second claims for ERISA violations are time barred and that Defendants are entitled to judgment as a matter of law.

Accordingly, Defendants' motion for summary judgment is hereby granted. In light of this ruling, Plaintiffs' motion for summary adjudication (*i.e.*, regarding the duty of prudence) is denied as moot.

This order resolves Plaintiffs' claims against all named defendants in this case, except potentially for Mr. Figueiredo and Mr. Ingersoll, neither of whom was identified as a moving party in Defendants' motion for summary judgment. Accordingly, the Court hereby orders the

13

parties to meet and confer and file a status conference statement by August 11, 2016, as to whether there are still any claims against Mr. Figueiredo and Mr. Ingersoll, or whether the Court's analysis in this order is equally applicable to them.

This order disposes of Docket Nos. 259 and 268.

**IT IS SO ORDERED**.

Dated: July 20, 2016

_____
EDWARD M. CHEN
United States District Judge